UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cv-24748

ANN O'MALLEY,

Plaintiff,

v.

PRINCESS CRUISE LINES, LTD.,

Defendant.

________________________________/

LOCATION: Audio-Video Conference

DATE: Tuesday, July 21st, 2026

TIME: 11:00 a.m. - 2:49 p.m.

DEPOSITION OF GERALD NIELSEN

Taken before Chancelor Merritt, Court Reporter and Notary Public in and for the State of Florida at Large, pursuant to a Notice of Taking Deposition filed in the above-styled cause.

EX. B

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
Law Office of Laurence M. Krutchik, P.A.
7450 SW 172nd Street
Palmetto Bay, FL 33157
By: Laurence Krutchik, Esquire
Email: lmk@lmklegal.com

ON BEHALF OF THE DEFENDANT:
Gray Robinson
515 N. Flagler Drive, Suite 650
West Palm Beach, FL 33401
By: Michael Drahos, Esquire
Email: michael.drahos@gray-robinson.com



C O N T E N T S


THE TESTIMONY OF:
GERALD NIELSEN

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MR. DRAHOS | 4 | | | |
| MR. KRUTCHIK | | 134 | | |

| | |
|---|---|
| Certificate of Oath | 144 |
| Certificate of Reporter | 145 |
| Notification Letter | 146 |
| Errata Sheet | 147 |

E X H I B I T S

| DEFENDANT'S | DESCRIPTION |
|---|---|
| Exhibit A | Notice of Deposition |
| Exhibit B | Expert Report of Gerald Nielsen |
| Exhibit C | Mr. Nielsen's Curriculum Vitae and Testimony History |
| Exhibit D | Mr. Nielsen's rate sheet and invoices |
| Exhibit E | Scolaro Material Index |
| Exhibit F | Email/Documents from Plaintiff's Counsel |
| Exhibit G | SeaCare Case Summary |
| Exhibit H | Princess Cruise Lines Policy MED 3104 |

| PLAINTIFF'S | DESCRIPTION |
|---|---|
| Exhibit 1 | Expert Medical Report of Dr. Gomez |




(Thereupon, the following proceeding was held:)
MR. DRAHOS: Okay, if everybody is ready.
THE STENOGRAPHER: Okay, I will swear in the witness. I did see his ID. Raise your right hand to be sworn, sir. Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
THE STENOGRAPHER: May counsel state their appearances and affiliations for the record.
MR. KRUTCHIK: Laurence Krutchik on behalf of the Plaintiff.
MR. DRAHOS: Michael Drahos on behalf of the Defendant.
THE STENOGRAPHER: Thank you. Counsel may proceed when ready.
MR. DRAHOS: Thank you.
Thereupon,
GERALD NIELSEN,
Was called as a witness and, having been first duly sworn, was examined and testified under oath as follows:

DIRECT EXAMINATION

BY MR. DRAHOS:
Q. Okay, sir, can you please state your name



for the record for us?
A. Gerald Nielsen. I go by Gary.
Q. Okay, thank you, Mr. Nielsen. My name is Michael Drahos and, as I stated a moment ago, I'm counsel for Princess Cruise Lines, who will be taking your deposition today in the case. So, let me first cover some housekeeping things. Today we are appearing virtually by Zoom. And so, because of that, there are just some preliminary matters that I need to cover to make sure that we are all on the same footing. First and foremost, do you have any physical paperwork in front of you that you may be relying upon at any point in time during the deposition today?
A. Yes, sir, as I stated before we went on the record, I have a clean copy of my expert report dated 24th June, 2026.
Q. Okay. Anything else on your desk other than that?
A. There is nothing case-related. It is a desk. I have my water. My phone is on do not disturb, and all other case materials for this and any other case are put away in cabinets or drawers.
Q. Okay. And what device are you using to appear today? Are you on a desktop?

A. I am on my company HP laptop. And the only-- the only apps or tabs or things that are running are the Zoom meeting that we are on, and a browser window that allowed me to initiate the Zoom.

Q. Okay. Thank you. And I would just ask that if at any point in time during today's deposition if you need to refer to your report, if you could please let me know that you're going to be doing that, or alternatively, if you plan to open up anything on your computer, any icons or folders or anything, please let me know that so I know that you are looking at something. All right? And then, of course, during the course of the deposition, I'll be putting up exhibits on the screen. And if at any point in time you're having trouble seeing those exhibits, or you need me to zoom in or zoom out or scroll down the page, I will work with you to make sure that you're able to see whatever you need to see on the screen. Okay?

A. Yes, understood.

Q. All right, great. So, now that we have that aside, the only other thing I need to do here is I wanted to mark some exhibits so that we can get an understanding of the scope of what we're going to be reviewing. And what I'd like to do first and



foremost-- can you see my screen, sir?

A. Yes, sir.

Q. All right. So what I put up on the screen, and what we'll mark as Composite Exhibit A, is a copy of the notice of deposition for today's proceedings. Is it my understanding, sir, that you're appearing today in response to this deposition as an expert for the plaintiff?

(Thereupon, Defendant's Exhibit A, was marked for ID.)

A. That is correct.

Q. And in preparation for today's deposition, did you have an opportunity to review the duces tecum, which is a fancy way of asking for you to produce certain documents and materials?

A. Yes, sir.

Q. Okay. And in having gone through that, did you produce everything responsive to Schedule A, with the understanding that I saw plaintiff's objections and I don't have any issue with you not producing tax records? Other than that, though, did you review 1 through 14, and produce everything responsive?

MR. KRUTCHIK: Mike, if I could just interject for a second. The tax returns-- the only other



things that were not produced were the privileged draft report documents, as indicated as well in the objections.

MR. DRAHOS: Yes, okay. And I have no issue about that either.

BY MR. DRAHOS:

Q. So, other than any drafts of your report and tax returns, did you review Schedule A and produce everything that would be responsive?

A. I did review Schedule A. If you could go to the second page for a second, I believe I have one comment regarding that page.

Q. Okay.

A. Yes, on item number 12. The list of information and other financial information, evidence of payment or compensation paid to you or your company for expert services, work, and testimony for the last three years, that would require working with both my personal accountant and company accountant. And with the amount of time that I had to review and provide to this, I did not provide that information specific to item number 12.

Q. Okay. And thank you for that. I also don't take issue with that in this case. Okay, so we've gone ahead and marked that as Exhibit A. Let me go



through some items specifically that I'm aware of, and then it's my understanding that counsel produced a share file a moment before the deposition started, which I want to go through in a second, too. All right, so--

MR. KRUTCHIK: Excuse me, Mike, I'm sorry to interrupt you. Just to be clear, I sent it in an email, as an attachment to the email. Do you want me to send it in a Dropbox link or some sort of ShareFile instead?

MR. DRAHOS: Let me get to that in a second, and we'll see if something's required.

MR. KRUTCHIK: Sure.

BY MR. DRAHOS:

Q. So, Mr. Nielsen, I'll put up on the screen here what we'll mark as Exhibit B. This is, as I understand it, your expert report dated June 24th of 2026, totaling 33 pages in substance. Do you see that there on the screen?

(Thereupon, Defendant's Exhibit B, was marked for ID.)

A. I do. It's 45 pages in total, including attachments.

Q. Okay. Well, the document that I have here, which we've marked as Exhibit B, is the actual

written substantive report, which on page 33 you've signed on June 24th, 2026. Do you see that there?
A. I do.
Q. All right. Now, the report that you have in front of you, that you made mention of, the printout-- is it identical to this report that I put up on the screen dated June, 24th?
A. It is. Up to page 33, I have the same exact signature page. But after that are the three-- the three attachments.
Q. All right, and we'll get to that in just a second. But before we do, what I want to be sure of is, since the time that you signed this report on June 24th, 2026 up until present day on July 21st, 2026, have you made any changes at all to this report?
A. No, I have not. And that's-- that's my standard practice. Once a report is done, once it's signed and dated, it's-- it does not get changed.
Q. All right. Now, during the formulation of this report, did you make any changes or modifications that were specifically requested by counsel?
MR. KRUTCHIK: I'm going to object, Mike, to that line of questioning. I believe that that's



privileged under the rule as far as what encompasses drafts of the report.
BY MR. DRAHOS:
Q. Okay. Following up with that, Mr. Nielsen, in formulating this report, which we've marked as Composite Exhibit B, did you rely upon any information that was provided to you exclusively through plaintiff's counsel?
A. The report was developed based on information received from counsel, primarily in writing, and that is all contained in attachment number three. There were phone conversations that were had. However, anything that was discussed during those conversations, I could say without hesitation that the opinions are my own.
Q. Okay. And when you say, "primarily in writing," is there information that you relied upon in this report that was provided to you through some sort of verbal statement made by plaintiff's counsel?
A. Not specifically that I can recollect. The discussions that we had would have to do with documentation that was provided.
Q. All right. Since the time that you filed this, or that you signed this report on June 24th,



2026, have you reviewed any additional information?
A. Yes, sir, I received information recently from counsel regarding this case.
Q. What information did you recently see?
A. I received an expert report authored by Captain Miller, and I received two medical expert reports. One from an expert on each side. Their names I don't recall off the top of my head.
MR. KRUTCHIK: I can tell you those, Mike, if you'd like.
MR. DRAHOS: Sure.
MR. KRUTCHIK: It was Dr. Parejo's report and Dr. Gomez's report.
MR. DRAHOS: Thank you.
THE WITNESS: Thank you. That is correct based on my memory now.
BY MR. DRAHOS:
Q. All right. Now, other than Captain Miller's report and the reports for Drs. Parejo and Gomez, have you reviewed any other additional information since the time you signed this report on June 24th?
A. No, sir.
Q. And did anything you read either in Captain Miller's report or Drs. Parejo or Gomez



change your opinion in the case?
A. All three reports contain information that, had I had those reports, I would have noted the information and footnoted the information. But the information from each of those reports go toward supporting my opinions. So, I do not believe that there would have been any substantive change to the opinions based on that.
Q. Okay.
A. And if I could further add to it, none of the reports provided information that would have led me to generate new opinions.
Q. How about abandoning the opinions?
A. No, sir. The information in the three reports-- there was information that I believe supported, further supported, each of my three opinions.
Q. What information specifically, as it relates to Captain Miller's report, further supported your opinions in this case?
A. Without having his report in front of me, some of my answer may well be a paraphrase, not an exact quote. But specifically, towards the end of the primary part of his report, he has-- I believe there were seven opinions. And his opinions three

through seven, the way that they're written, with additional information from the summary parts of his report, if there's information in that section, that I would have used as support for all three of my opinions.
Q. Okay. We're going to get back to that in a little bit. I'm continuing on through our housekeeping here. I will put up what will mark as Exhibit C to the deposition up on the screen, and this is, as I understand it, to be Attachment One to your report. Five pages in total, containing what appears to be your CV and testimony history. Did I accurately summarize Attachment One?
(Thereupon, Defendant's Exhibit C, was marked for ID.)
A. Yes, sir.
Q. Okay. And in looking at Attachment One, specifically your CV, is this up to present date?
A. Yes, it is.
Q. Okay. And same for testimony history, is this up to present date?
A. The date on that version of my testimony history was from May of this year. I have had one additional deposition since this version of my history.



Q. And what was the name of that case?
A. It was Armant, A-R-M-A-N-T, versus C. Robin Pipeline and Energy Transfer.
Q. And which court was that case litigated in?
A. I believe it was Harris County, Texas, although I would like to confirm that before swearing to it.
Q. Okay.
A. But if that is important, I'll be glad to do that during the break.
Q. Thanks, sir. And did you testify for the plaintiff or the defendant?
A. It was for the plaintiff.
Q. And what law firm retained you in that case?
A. The Spagnoletti Law Firm.
Q. Okay. Continuing on, we'll mark as Exhibit D what I understand to be Attachment Two of your report, containing your rate sheet. And this would be the rate sheet that is, of course, applicable to the services you provided in this case as an expert?
(Thereupon, Defendant's Exhibit D, was marked for ID.)
A. That is correct.



Q. Okay. So, I didn't see any billing invoices generated for this case. One of them.
MR. KRUTCHIK: Excuse me, Mike. That is material that I produced to you this morning.
MR. DRAHOS: Okay. Give me a second.
MR. KRUTCHIK: And if you need me to-- like I said earlier, if you want me to resend it in a Dropbox, I'm happy to do that. If you want to give me a minute, I can make that happen.
MR. DRAHOS: Okay, hold on a second.
MR. KRUTCHIK: Yes, sir.
MR. DRAHOS: So, Larry, I'm looking at this. I'm seeing icons, they say Dennis versus CCL. Is that a typo, or is there--
MR. KRUTCHIK: There's the-- my understanding is there's the invoice from the Dennis matter, which is responsive to the prior compensation of Mr. Nielsen, because he was involved in that case as well.
MR. DRAHOS: Okay.
MR. KRUTCHIK: Did these attachments not come through?
MR. DRAHOS: No, they did, but I'm just going through them to see if I can tackle this quickly.
MR. KRUTCHIK: Yep.
MR. DRAHOS: I'm seeing two invoices. Is that



accurate, Larry, or is there more than two?
MR. KRUTCHIK: Hold on, let me pull up the email. Two invoices total for Mr. Nielsen?
MR. DRAHOS: For this case. For this case.
MR. KRUTCHIK: Now, let me double-check.
THE WITNESS: If I may, that should be correct. The initial invoice would have been for a retainer, and then the second invoice would have been early July, which would have covered the consulting-- research, consulting, document review, and report writing with a credit for the retainer on it.
BY MR. DRAHOS:
Q. Okay. So, what I'd like to do then is I'm going to amend Exhibit D to include the invoices that have been provided. I'm going to put those on the screen so I know we're talking about the same thing. So, Mr. Nielsen, I'm looking here at what is part of, now, Composite Exhibit D. It looks to me like there's an invoice dated February the 23rd, 2026, which would be a $5,000 retainer, and that would apply to your services in this case?
(Thereupon, Defendant's Exhibit D, was marked for ID.)
A. That is correct.
Q. All right. And does that accurately

reflect the time that you were retained in the case, February 23rd?
A. It's possible that the retainer invoice went out the day after I was retained, but yes, it's going to be within a day or two of that date.
Q. All right. And the second page of the billing invoice is dated June 30th, 2026, total balance being $6,679.24. Correct?
A. The date of that invoice would have been June 30th. We do our invoicing at month end. And going by that, initial conversation, communication, and documentation review for this case was on February 20th.
Q. Okay. And so, is this $6,679 in addition to the $5,000?
A. That is correct. That shows a $5,000 credit for the retainer payment. So, my effort for this case would have been $11,679.24.
Q. Okay.
A. I do have a dog barking downstairs. If anybody else can hear that, I would be glad to go and put him up elsewhere in the house.
Q. It's not bothering me.
MR. KRUTCHIK: Me neither.
BY MR. DRAHOS:



Q. So, what is your billing practice, Mr. Nielsen, so that I can understand this? Do you bill on the same day that you render services? So, in other words, for example, on March the 31st, 2026, I see "document review, half hour." Does that mean on March the 31st, you spent a half hour looking at documents in the case?
A. That is correct.
Q. Okay. And so, does that then also mean that you would have started writing your report in the case on April the 22nd?
A. That would have been the first substantive amount of time spent. Earlier on, probably in late February or early March, I would have taken our standard report template and started to put information on it.
Q. Okay. And I also see here that there are various charges for report writing throughout various days ending on June the 24th. So, does that mean that June the 24th would have been the date you actually completed your report?
A. Yes, that would be correct. Typically, there is a time entry for the day that the report is signed and dated. That is the day that it is assembled from the original Word doc, and the



attachments are developed and put on, and signed and sent off.
Q. Okay. And so, when I see here "client communications," who specifically are you referring to when you say client?
A. That would have been the retaining attorney.
Q. Okay. And in this case, have you ever spoken to Mr. or Mrs. O'Malley?
A. No, I have not.
Q. Have you ever spoken to anyone other than counsel for the plaintiff regarding this case?
A. Casual conversation with other members of my firm when talking about workloads. I would have discussed it with my proofreader if she had any questions, I don't remember any off the top of my head. Other than that, no.
Q. Okay. So, who among your team has a role in developing this report?
A. Nobody had-- there was nobody else involved in this specific report. There are in the billing. If you see under the rate, there's a $120-an-hour rate that would either have been our case manager handling documents provided by counsel and putting them into our software system, or our



proofreader. They're both billed at the admin rate of $120 an hour.
Q. And so, the proofreader is an actual human being that is doing editing for grammatical errors and things like that?
A. Grammatical errors, consistency, readability, without changing opinions. She may suggest, for example, placing one sentence before another to enhance readability, which is what one of her degrees is in.
Q. And so, when you say consistency, what does that mean? Does that mean that she's reviewing it to make sure that your opinions are all consistent?
MR. KRUTCHIK: Form.
THE WITNESS: No, I would say more that-- I don't want to oversimplify it by saying grammar, but just ensuring that if we're referencing a vessel, it's referenced the same way throughout. If you've looked closely at the report, you would note that the actual whole opinion header is in three places. It's in the summary, it's on the opinion page, and it's in the conclusion. Sometimes during development of a report, I may end up having different wording in those sections. She would ensure that, for

consistency, that wording is the same across those three sections. And if there was an inconsistency, she would ask me which one is correct.

BY MR. DRAHOS:

Q. Did you use artificial intelligence in any aspect of either formulating your opinions or writing your report in this case?

A. The only area that I use any type of AI in is I quite often use one of the AI tools as a better way to search or Google for information. Instead of using Google as a search tool, I quite often use Grok as a search tool.

Q. Did you use Grok in this case?

A. I don't specifically recall it, but I would say, most likely, yes.

Q. And if you most likely used Grok, for what purpose would Grok have been used in this case?

A. The example that I'm thinking of is I know that I reference in the report a news article about a Mexican Navy MEDEVAC of a vessel. So, what I would do is, instead of Googling, I would use Grok, and then, with Grok, you can click through to the results, the actual results that it used for its answer, and I would go to the source document. So I would not ask Grok something and cut and paste that,



put it in a report, and footnote it. I would use it to find sources, and then I would drill down to the actual source, make sure that what Grok found is actually what I'm looking for, and then I would reference the actual source after going there.

Q. Okay.

A. I read too many horror stories about AI-- not imagination, but hallucinations and I'm going to do everything I can to make sure that I don't make that mistake.

Q. All right. And so just to be sure, then, that I understand your answer. Specifically as it relates to how you plotted the ship's itinerary, did you use artificial intelligence for any aspect of that role in this case?

A. No, I did not. The data points that I used are from the vessel's AIS, Automatic Identification System. They are compiled by a company called Vessel Finder, and my company pays Vessel Finder for AIS data on cases when it is requested or required. And in the data or the product that Vessel Finder provides is their Voyage Analyzer, which provides the graphics that I use in my screenshots in the report. The only information on those screenshots that was not provided by Vessel Finder would have



been the red circles showing the specific data points at certain times.

Q. Okay. And lastly, just to close the loop on this. On this billing record that I'm looking at here, when it says "client communications," you told me that you were speaking to retaining counsel. Was that Mr. Krutchik or Mr. Scolaro?

A. That would have been Mr. Krutchik. I don't recall any conversations directly with Mr. Scolaro regarding this case. His name is on the report, that was at the firm's request early on when I was retained.

Q. And so, I see that you have worked with the Scolaro firm, in addition to this case, also in the Dennis versus Carnival matter, and you are working with them in the Perlman versus Carnival matter as well?

A. That is correct. I've worked with them on the Dennis case. If my memory serves me correctly, that case closed. And the invoices I provided, there were two other cases that I am engaged with them on. They are both very preliminary at this point. I've not done any real work on them at this point.

Q. All right. So, I'm aware of the Perlman case and this case. Is that two cases you're



referring to, or is there another one?

A. There were four cases total. I may mispronounce it, Brambilla or Brambila.

Q. Okay. All my cases, too, Mr. Nielsen, so we're going to get to know each other quite well. Maybe I'll come to Houston for the next one.

A. More than welcome. Just watch the weather first.

Q. Yes, sir.

All right. Next up here, we'll put up as Composite Exhibit E what I understand to be Attachment Three to your report. Can you see it there on the screen?

(Thereupon, Defendant's Exhibit E, was marked for ID.)

A. I can, yes.

Q. Okay. Now, Attachment Three is an index of material that was provided to you by the Scolaro Law Firm. Is that correct?

A. Yes.

Q. All right. And I believe I know what this is referring to, but let me just make sure. These IMG entries that we see here, are those photographs that were taken by Mr. O'Malley?

A. I believe that they were all taken by Mr.

O'Malley, but yes, they are the photos and movies.
Q. Okay. And did you rely upon any photo or movie generated by Mr. O'Malley in support of your opinions in the case?
A. I do not recall any of the photos that would have influenced or guided me in the opinions. The majority of the photos had to do with the actual evacuation on the 8th, which is not something that I provide an opinion on as far as the method of evacuation or the handling of Mrs. O'Malley or anything like that.
Q. Okay. While we're on this subject, I wanted to go-- I'm referring to page eight of your report, and you have a section here, "Document Review and Research." So, we've already talked about the materials that the Scolaro Law Firm has provided, right? That's all entirely encompassed in that index we just looked at?
A. Correct.
Q. All right. And then you make mention of research and preparation, and you're citing some specific things and so I want to ask you about that. Particularly as it relates to the Electronic Code of Federal Regulations. What specifically did you look through on that site, sir?



A. Without going through my report, I'm not certain if I footnoted anything on there.
Q. I didn't see anything specific, which is why I'm asking. So, is there any particular Code of Federal Regulations that you researched and that you're relying upon in support of your opinions in this case?
A. No, I believe-- I am a little uncertain as to what I used that for. I went there, it's in the report, I went there at one point. The best recollection I've got is that I was looking for information on U.S. Coast Guard Form 2692 and the applicability of that to this type of incident. But as you noted, you're saying that I don't have a footnote in there, I don't remember a footnote. I may have gone to that for information on 2692s and then determined that it really wasn't relevant to my opinions.
Q. Okay. Moving on here, you have the Cruise Lines International Association website. I did see a CLIA reference. Other than citing to that CLIA reference, which we're going to talk about, what else did you do on that website to develop your opinions in this case?
A. There is the reference in the report to



their statement about medical facilities, and that was the purpose of going to the CLIA website to get the specific wording of their policy.
Q. Okay. And how about the Carnival Corporation website? What specifically were you looking at there?
A. Vessel information.
Q. And the Princess Cruise Lines website?
A. It would be the same. The vessel information and also the itinerary information for this case.
Q. All right. And how about the Cruise Ports Guide website? What were you looking for there?
A. Specifically to that, I was looking for information on the cruise ports that I referenced in the report. Los Angeles, San Diego, and Ensenada.
Q. Okay. Other than identifying those ports, was there any other information that you obtained from that website that you're relying on in support of your opinions?
A. Not that I recall. If it's not in the report, then I believe that that was information generally on the port, what its capabilities were, what cruise lines went there, general information that was included in the report.



Q. Okay. And lastly, the San Diego port website, what were you looking for there?
A. Same as the Cruise Ports Guide website, although this one had more specific information on the Port of San Diego. And I believe that I have in my report-- I make a statement about the cruise lines that use the port and the fact that, if I recall correctly, they have two cruise terminals in the port.
Q. Okay. And so, rounding out the housekeeping portion of this, what I'm going to do is mark as Exhibit F the email with information that was provided by counsel at the start of the deposition. And Madam Court Reporter, I will, of course, forward all of these exhibits to you after the depo is over, and I'll copy Mr. Krutchik on that. All right. So, let me turn our attention back to your CV, sir, and page two of your report. And you're welcome to refer to either if you need to, or just answer these questions off the top of your head, it doesn't make any difference to me. But let me just clarify a few things. First, it appears to me, and can you confirm for me, that you are not a medical doctor?
(Thereupon, Defendant's Exhibit F, was marked

for ID.)
A. That is correct.
Q. All right. And you don't hold any medical licenses or certifications of any type?
A. I formerly held certification as an EMT.
Q. Did you say that in the past tense? You formerly held?
A. Yes. Yes, I'm just volunteering that information because I believe it's responsive to your question, but not something that I use in generating opinions relative to this report.
Q. All right. And the EMT certification that you did hold, is that still current?
A. No, it's not.
Q. When did it expire?
A. Sometime in the late 1990s.
Q. And so, you would agree that you are not holding yourself out in this case as a medical expert?
A. That is correct.
Q. And that would mean that you would agree that you're not qualified to offer any medical opinions in this case?
A. Correct.
Q. Okay. I see that you obtained a bachelor's



in marine engineering systems in 1994?
A. 1984.
Q. 1984. Okay. And is that the highest level of education that you've obtained?
A. That is the highest degree that I attained, yes. The Bachelor of Science degree in 1984.
Q. All right. How many years of study are required in order to obtain that Bachelor of Science?
A. It's a standard four-year course at the United States Merchant Marine Academy. It's a little bit different than most other schools in that, during half of your junior and sophomore years, you actually work onboard commercial vessels while also going through the academic coursework.
Q. Okay. And I see that you took-- it looks like a course in legal studies from the University of Illinois?
A. Several courses in their master's program. It was not with the intent of obtaining the degree. This was in 2020 and 2021. I had just started doing litigation support work, and I thought it would be a valuable tool to better understand the industry that I was working in.



Q. So, is this like online courses that you take?
A. Yes, they were.
Q. How many courses in total were involved?
A. Three courses.
Q. And then I see here that you're a member of the Maritime Law Association of the United States. Is that correct?
A. Yes.
Q. You're a current member?
A. Yes, I am.
Q. All right. Do you serve on any boards or committees?
A. No, I do not.
Q. Have you ever held any leadership position in that organization?
A. No, I have not.
Q. Have you ever presented on a topic or provided any type of CLE material?
A. No, I have not done any presentations to the MLAUS.
Q. Okay. And I also see here that you're a member of SEALI as well?
A. That is correct.
Q. Madam Court Reporter, that's S-E-A-L-I.



And similar question, sir, do you sit on any boards or committees?
A. I do not.
Q. Have you ever held any leadership position in SEALI?
A. No.
Q. Have you ever presented on any topics?
A. I provided a lunch-and-learn topic, and I believe it was for SEALI, 2021 timeframe. I don't list it as a publication because it wasn't that. It was a short overview of the role of a maritime expert, and then some Q&A.
Q. Did you present with anyone else, or were you on the stage by yourself?
A. It was online. This was still during COVID. It was just an online lunch-and-learn.
Q. Okay. Are you a member of CLIA?
A. A member of, I'm sorry?
Q. CLIA, the Cruise Lines International Association.
A. To the best of my knowledge, the only members are actually cruise lines. I don't know if an individual could be a member, but I am not a member.
Q. Have you ever attended any CLIA

conferences?
A. When I was in the cruise industry, CLIA was at the time known as the International Council of Cruise Lines. And while I was in the industry, I was a member of several of their working committees, but I am not involved with them currently.
Q. Okay. And so, we're going to talk about this in just a bit, but are you telling me that that was sometime around 2000, 2002 when you last left Carnival? What I'm looking for is, when is the last time that you went to any type of a CLIA conference or participated in any aspect in that organization?
A. That would have been while I was employed by Carnival Corporation, which ended in 2002.
Q. All right. So, that means 2002 would have been the last time you had any involvement?
A. In a working capacity, yes.
Q. Do you have any type of a relationship or capacity with them since?
A. No.
Q. I also see that you were in the United States-- was it Navy Reserve?
A. Correct. Upon graduation from the Merchant Marine Academy, you graduate with a Coast Guard license and a commission in the United States Naval



Reserve.
Q. And so, when did your duties in the Naval Reserve formally end?
A. I believe it was in 2000.
Q. How often did you actually serve aboard a vessel in that capacity?
A. I did not serve aboard naval vessels during the time that I was a commissioned officer.
Q. So, what did your service involve?
A. The reserve obligation coming out of the Merchant Marine Academy is that you either serve in normal reserve capacity, which would be monthly drills and two weeks a year, or you have to be in the industry. And I fulfilled my obligation through working as a ship's officer.
Q. And when you say working as a ship's officer, what did that entail specifically?
A. That was as a licensed-- U.S. Coast Guard-licensed engineer onboard United States-flag vessels.
Q. And so, when you worked as a licensed engineer onboard U.S. Coast Guard vessels, specifically, how much time did you serve in that capacity per year?
A. When I was sailing, it wasn't U.S. Coast



Guard vessels. It was U.S.-flagged merchant vessels. I would be onboard the vessel as an engineer typically six months a year, either in two-month or three-month blocks with equal time off after.
Q. When was the last time you served in that capacity? That would have been 2000?
A. No, I stopped sailing as a licensed engineer in 1991.
Q. And so, if your honorable discharge occurred in 2000, what did you do for the U.S. Naval Reserve from 1991 to 2000?
A. Other than attending a couple of classes, I did not have any involvement with the Naval Reserve between 1991 and 2000.
Q. Okay. And so--
A. Let me augment that a little bit. There was an annual form/report that I had to fill out, basically stating what I was doing in the industry.
Q. Okay. So, have you ever served onboard a U.S. Coast Guard vessel?
A. No, I have not. I don't believe that that's stated or inferred anywhere in my resume.
Q. All right. Well, you don't need to read too much into my questions, I'm just making sure I understand the background.



A. That's fine. Understood.
Q. Did you ever serve in any capacity for any U.S. Coast Guard rescue station?
A. No, sir.
Q. So, you indicate in your-- I think it's your report? Yes. Okay. So, page six of your report. I can put it up on the screen if you need me to. You indicate that you served in the role as Lieutenant Commander for the United States Naval Reserve. Can you explain for me what that actually means? Were you a Lieutenant Commander onboard a U.S.-flag vessel? I don't understand--
A. Okay. I think that I can understand this-- I'm sorry, I think I can explain this in a simple manner.
Q. Okay.
A. My role onboard merchant vessels was as a U.S. Coast Guard-licensed engineer, starting as a third engineer and working my way up. Parallel to that, but not related, not used while I was onboard vessels, is that I was commissioned starting as an Ensign in the United States Naval Reserve upon graduation from the Merchant Marine Academy. By sailing onboard U.S.-flag vessels, I was able to upgrade my Coast Guard license from third engineer

to second, to first, to chief engineer. While at the same time, by fulfilling my obligation to the Reserve, they promoted me from Ensign, to Lieutenant (j.g.), to Lieutenant, to Lieutenant Commander. I did not-- my role or my position as a commissioned officer in the United States Naval Reserve was not used while I was working onboard vessels. I did not wear a naval uniform onboard vessels.

Q. Okay. And so, I think that clarifies it for me. Thank you. So, what you're saying, then, is that you never served in a command position in a militaristic fashion.

A. That is correct.

Q. Okay. So, have you ever, in any capacity, coordinated any medical evacuations on behalf of the United States Navy or the U.S. Coast Guard?

A. No, I have not.

Q. Have you ever sailed on a vessel that operated off the coast of Baja California, which is what we're talking about here today?

A. Is your question specific to as a licensed engineer?

Q. Well, why don't we do it that way, and then we'll just see to what extent it's applicable. So, as a-- in your capacity as a licensed engineer



for the United States Coast Guard aboard these U.S.-flagged vessels, did any of your ships ever sail off the coast of Baja California?

A. Early in my career, I was onboard oil tankers that were doing the Alaska-to-Panama run. So, yes, as both a cadet, meaning pre-licensed, and as a licensed engineer, I did sail along the entire West Coast of the United States.

Q. Okay. And when you were doing that, when would have been the last year that you would have had that experience?

A. This would have been in the mid-1980s, '86, '87.

Q. Okay. And since you qualified it, have you sailed off the coast of Baja California in any other capacity?

A. When I was with Carnival Corporation, and also with Seabourn and Cunard, which I was seconded to during my time with Carnival, I regularly worked onboard the vessels, their vessels, in an audit capacity. And yes, I did West Coast cruises from Alaska down to southern Mexico.

Q. All right. So, then, does that mean that you have not sailed the coast of Baja California in any capacity since at least 2002?



A. That would be correct. My answer assumes that it really doesn't matter that I was on a cruise ship off of there at some point.

Q. What do you mean by that? I don't understand.

A. As a passenger on a cruise ship out of California in approximately 20-- I would say 2012, 2013, somewhere around there, I was a passenger on a cruise ship off of Baja California.

Q. Which ship was that?

MR. KRUTCHIK: Form.

THE WITNESS: I honestly do not recall.

BY MR. DRAHOS:

Q. So, I'm presuming that you've sailed on Carnival vessels, you've sailed on Seabourn vessels, and Cunard. Have you ever sailed on a Princess vessel?

MR. KRUTCHIK: Form.

THE WITNESS: In a working capacity or as a paying passenger?

BY MR. DRAHOS:

Q. Let's start with working.

A. Carnival Corporation purchased Princess shortly after I stopped working with them, so they were not part of the fleet when I was there, so I



did not have the opportunity to work on their vessels.

Q. Okay. And how about in a private paying capacity? Have you ever sailed on a Princess cruise vessel as a guest?

MR. KRUTCHIK: Form.

THE WITNESS: There's one cruise that I recall, a family cruise. It was after my departure from Carnival Corporation. I would say 2005, 2006 timeframe.

Q. Is that the Emerald Princess, or do you recall the name?

A. It was the Grand Princess.

Q. Okay. So, your report here on page six also makes mention of the fact that you are or were a certified International Safety Management Code auditor, a certified International Standards Organization auditor, and a certified International Standards Organization auditor, it looks like, 9000 and 14000. So first, do you still hold those certifications?

A. I do not hold the formal certifications anymore, no.

Q. When did they expire?

A. The ISM Code auditor, that was a

certification that I held as part of my working role with the American Bureau of Shipping. And let me expand that, all three of those were certifications that I held while working at the American Bureau of Shipping. They were certifications issued by ABS. So, they would have-- I don't know if expire is the right term, or if they just would no longer have been valid once I was no longer working for ABS.
Q. Okay, remind me when that was.
A. That would have been 1997, when I left ABS to go and work for the cruise industry.
Q. Okay. And you also make mention here of having served as a cruise line Designated Person Ashore, a cruise line Maritime Audit Director, and a cruise line Safety and Environmental Management Director. You see that there on page six of your report?
A. I do.
Q. Okay. So, first, were those all in your capacity while working at Carnival?
A. They were all within my capacity of working at Carnival Corporation. The Designated Person Ashore and the Safety and Environmental Management Director were the two titles that I held during the period of time that I was seconded to



Seabourn and Cunard cruise lines, which were both Carnival Corporation holdings at the time.
Q. All right. And you know, Mr. Nielsen, it's interesting. I've been doing this now 25-- almost 25 years. I've never heard of a Designated Person Ashore. What exactly is that role?
A. The DPA, Designated Person Ashore, is a position that is mandated by the International Safety Management Code.
Q. And what is a Designated Person Ashore responsible for?
A. Within the ISM Code, there is an entire section that goes into the requirements of the position. But at the highest level, it is somebody shoreside who has direct reporting lines to the president of the company, or senior management, I believe is what it says. My role had a direct reporting relationship to the president of Cunard and Seabourn. And this person has to be known and announced and available to anybody onboard vessels. There have to be notices prominently posted on the vessel and still to this day. So that if there is a safety or environmental issue onboard a vessel where the person who is reporting the issue does not feel that they are getting an adequate response onboard



the vessel, the Designated Person Ashore is an allowable link or resource to them. Designed in a way where there should be no retribution for somebody reaching out outside of their normal chain of command to the designated person, the DPA.
Q. Well, now I know why I've never heard of this. Fortunately, it's never come up. All right. So, when was the last time that you served in that role?
A. That role was specific to my time at Cunard and Seabourn Cruise Lines, which ended in August 2001, when I was brought back into Carnival Corporation in their audit department.
Q. Okay. So, we've been going for an hour. I'm going to go off the record here for a brief five-minute restroom break for everyone. And then we'll come back at 12:10, if that works for everybody. Very good. Thank you.
THE STENOGRAPHER: Off the record.
(Thereupon, a recess was taken.)
BY MR. DRAHOS:
Q. Okay, Mr. Nielsen, we're back on the record. When we left off, I was actually getting into some more detail about your employment. And so, what I'd like to do for both our benefit is I'm



going to put up on the screen what was previously marked as a composite to the deposition, this is your CV. And I'd like to ask you specifically some questions about your role during your time working at Carnival Corporation. So, let me first start by asking if I'm understanding this correctly. Does this mean that your total time served with the company would have been from 1997 to 2002?
A. Correct.
Q. All right. And would there have been any interruptions in your employment during that timeframe, or did you continue to work throughout the entire about five years?
A. I worked for Carnival Corporation throughout the entire five years, with approximately 18 months when I was seconded over to Cunard and Seabourn Cruise Lines. But they were Carnival Corporation holdings, so my ultimate employer, Carnival Corporation, did not change.
Q. All right. And so, does that mean, then, that from the timeframe of 1999 to 2001, you would have held both these titles? Director of Maritime Audit and Director of Safety and Environmental Management?
A. No, when I was seconded over to Cunard

Line Limited, which was Cunard and Seabourn Cruise Lines, I did not hold the maritime audit title during that period of time.

Q. Okay. I'm glad I asked about this, then. So, let me just make sure I got it. So, that would mean that from 1997 to 1999, you would have worked as the Director of Maritime Audit for Carnival. And then from 1999 to 2001, you would have worked as Director of Safety and Environmental Management for Cunard. And then, in 2002, you would have returned to your role as Director of Maritime Audit?

A. That is correct.

Q. All right. And you've used this word, seconded. I'm not familiar with that. I don't know if it's a fancy word, or if it means something specific. What does that word mean?

A. Okay. I don't view it as a fancy word, it's one that I know is used within the industry. It's when you're taken or assigned from one part of a company to another with the stated intention of you returning to the original role at some point.

Q. Okay.

A. And I know I've used that both in my time at Exxon and with my time at Carnival.

Q. Okay. Well, I learned a new word today,



then. So, in any capacity while working at Carnival Corporation, whether it was in the role of Director of Maritime Audit or the role of Director of Safety and Environmental Management, did you ever play any role in drafting or revising any HESS policies and procedures related to medical operations onboard the ships?

A. Specific to medical operations, not that I recall.

Q. Okay, and I qualified that. So, let me just make sure. I said medical operations onboard the vessels, but I want to now just expand that as broadly as I possibly can. Did you ever have any role in drafting or revising any HESS policy or procedure relating in any capacity to medical operations?

A. So, while I was seconded over to Cunard, which I already stated was both Cunard and Seabourn Cruise Lines, I authored their safety management system. Their safety management system would have had sections regarding-- just, I don't want to get too specific with the wording because I don't recall the specific sections, but there were sections on reporting which would have covered medical incident, injury, illness reporting. So, I did not author the



actual HESS procedures. I don't believe they were called HESS procedures at the time, they would have been contained within each company's safety management system. While I may not have authored the actual wording, I was responsible for the safety management system that they were contained in.

Q. Okay. And so, specifically as it relates to medical incident or injury reporting, can you give me an example of what that would entail?

A. In the safety management systems, as they were written at the time, there would have been guidance in there on incident, illness, injury reporting. Who to advise, when to advise them, what reports would need to be filled out, who would fill them out, who would notify the Coast Guard, who would notify the flag state, which is the flag of the country where the vessel is actually registered in. Who would provide notifications to classification societies if there was an equipment or a system breakdown. So, that information was contained within each company's, each operating company's safety management system at the time.

Q. Okay. So, in other words, did you ever have any role in the formulation or adherence to any policies or procedures within any Carnival brand



relating specifically to medical disembarkation or medical evacuation?

A. No, I would not have been the author of those specific documents.

Q. Did you ever have any role in the evaluation of performance of any medical staff onboard any Carnival vessels?

A. No.

Q. So, you indicate here on your CV that you were a subject matter expert for regulatory compliance, including the ISM Code. And I wanted to ask what that means specifically. What did that-- when you called yourself-- or when you call yourself, a subject matter expert for regulatory compliance with the ISM Code, can you tell me specifically what that meant?

A. Absolutely. Prior to joining the cruise industry, Carnival Corporation, in 1997, I was an ISM auditor and marine surveyor for the American Bureau of Shipping, a classification society. The ISM Code came into force in the early-to-mid 1990s. Before that, it did not exist in that form. There was a requirement for different vessel types to comply with the ISM Code. Passenger vessels were one of the earliest types of vessels that were required

to comply. I was one of the first trained ISM auditors. The American Bureau of Shipping and other classification societies were the recognized organizations that could provide ISM auditors and audits. So, by virtue of that, I was one of the early trained ISM auditors and experts on the International Safety Management Code and what it required with regard to documented safety management systems for shipping companies and on their vessels. I regularly audited the safety management systems of companies as they were implementing them. And because of that knowledge and experience, in 1997, when Carnival Corporation created their maritime audit group, which they placed in their already existing audit function, I was hired from ABS based on my knowledge and experience with the ISM Code and how it applied to vessels.

Q. Okay. So, during your time at Carnival, did you ever have any role in auditing whether or not the medical operations, either on sea or on land, complied with the ISM Code?

A. Our role at that time, being part of the corporate audit group, we were not within any of the single operating companies. Our role, one of our roles, many roles, was to ensure that each operating



company's safety management system met certain thresholds. So, our group, my group, would have reviewed the medical policies and procedures. We would have audited them, but no, we did not write them. We would look at them to ensure that they all had similar thresholds that met the corporate requirements.

Q. During your time at Carnival, following your audits of any medical policies or procedures, did you recommend any changes, revisions, or deletions of any sort?

A. I do not recall specifically if we did or not. We-- regularly it was our primary function to review documentation and suggest changes. I do not recall any specific changes that were requested of the medical policies and procedures.

Q. Okay. And I guess, just to put a cherry on top of that, what I'm wondering is, do you have any specific recollection of ever finding in any of your audits that any aspect of the medical operations in any Carnival brand was not in compliance with the ISM Code?

A. Not that I recall.

Q. Do you know who Grant Carley is?

A. I'm sorry, could you repeat the name?



Q. Yeah, Grant Carley.

A. I do not believe so.

Q. How about Rick Miller? Did you ever-- do you know Rick Miller?

A. The expert who wrote the report that I reviewed?

Q. Yes, sir.

A. I do not know him. He was at Carnival after I was there.

Q. Did you have any role whatsoever in the design and construction of the Health Operations Center at Carnival?

MR. KRUTCHIK: Form.

THE WITNESS: No, that was both the HOC and the FOC. They were both established after my time at Carnival.

Q. And also in your resume here, you indicate that you actively participated with the Cruise Lines International Association on their safety, environmental, and technical committees. Is that what we've previously talked about, or is that something in addition?

A. That is what we previously talked about. I do state that it's called CLIA in there because that is the current name of the organization. At the



time, it was still the International Council of Cruise Lines, the ICCL, but it's the same working industry group just under a different name.

Q. All right, so being that we're being so careful with our word choice, let me just make sure then that during the time that you had any involvement with the Cruise Lines International Association, were you ever on any committee, or did you participate in any committee that related to medical operations?

A. That list-- on my CV I say safety, environmental, and technical committees. I was also on their Public Health Committee, which had to do with the Vessel Inspection Program. And that had aspects in it regarding capabilities, equipment onboard, hospital beds, things like that. So, my involvement would have been in ensuring that the operating companies met the requirements of the United States Public Health, which was part of the Centers for Disease Control, CDC.

Q. Okay. When you say met the United States Public Health, are you referring to like how they handled gastrointestinal illnesses and viral outbreaks like that, or are you talking about actual administration of medical care?

A. The two aspects of it would have been-- one that you just mentioned, there were thresholds for gastrointestinal illnesses, norovirus, things like that. We would ensure that they had policies in place that, if the number of cases exceeded the threshold, that there would be reporting. The other aspect of it would be physical capabilities. Do they have the appropriate number of beds and spaces and equipment around the vessel? And-- I don't recall the exact term, but they are similar to a crash cart, but they're go-bags that they could grab to get to anywhere on the vessel quickly. So, it was ensuring that they met the requirements of the USPH and CDC.

Q. Okay. And is the physical capabilities limited to their ability to respond to GI illnesses and noroviruses and things of that nature, or are you talking about how they would respond to 911 calls and general medical care?

A. How they would respond to any medical emergency on a vessel. I'm trying to be sure that I'm specific. This was to ensure that they had the equipment and capabilities that were required by the United States Public Health Vessel Sanitation Program and CDC requirements.



Q. All right. So, those regulatory agencies, then, would actually set the standards, and your job was to make sure that the cruise line was complying with those, if I'm understanding you correctly?

A. That was part of the audit role that we had in the corporation. And then specific to my role at Cunard and Seabourn, as part of safety and environmental management, I had public health reporting in my job description also.

Q. All right. So, to finish up this line of inquiry, then, I'm pretty sure I understand it, but let me ask you specific questions to make sure I leave here with a clear understanding, since this is the first time you and I are meeting, and it sounds like it won't be the last. So, do you have any practical experience? And if you need for me to explain what I mean by that, I'm happy to, but hopefully you understand what I'm asking. Do you have any practical experience in actually coordinating and effectuating medical evacuations onboard cruise vessels?

A. My involvement would have been from shoreside notifications after it was determined that there was a MEDEVAC that had to be effected. And this was only during my time at Cunard and Seabourn



Cruise Lines. I was the point of contact shoreside to advise when the medical evacuation was needed, and it was in some way not normal, not standard, additional notifications or issues with regulatory bodies that required escalation or further notification.

Q. Okay. So, I thought I got what you were saying, and then you started saying something different towards the end. So, when you say point of contact to advise when a medical evacuation was needed and not effectuated in a normal or standard way, are you saying that you were involved in reporting that type of circumstance to a regulatory body, but not actually the one making decisions as that evacuation was underway?

A. That is correct. And I think I can clarify. If there was an illness onboard and the person was being medically disembarked during a normal port call and everything was going as planned, there were no issues with regulatory bodies saying, "No, you can't do this," I would not be advised, typically.

Q. Okay.

A. However, if, for example, one case I recall, there was a Coast Guard helicopter that



effected an evacuation, and the patient was dropped off at the nearest-- basically, the nearest land in the Caribbean that had a hospital, and they needed to be then transferred back to the U.S. I received that phone call in the middle of the night to assist with getting the MEDEVAC back plane to get the person back to South Florida. It was off-- the issue was off the vessel at that point.

Q. All right, so you've spoken of this very specific circumstance. How often would you have any involvement of any sort regarding medical evacuation of guests or crew onboard any cruise vessel?

A. My best recollection, and again, this is at my time specific to Cunard and Seabourn, would be I would be involved in some capacity once every six weeks, twice every three months.

Q. All right. And in each and every one of those circumstances, then, your involvement would have come after the operation had already occurred? Meaning whether it was an emergency evacuation at sea or a medical disembark in port, you would have been informed after all of that activity had already been completed?

A. I would say that that's generally correct. I may have on certain-- on certain cases, the

decisions regarding evacuation may have still been going on, and I may have been questioned about, "Who do we need to advise?"

Q. Okay. So, if ever there was an instance when you were consulted regarding an ongoing operation, the purpose of that consult would be to provide insight on who needed to be informed of the activity?

A. Yeah, I would say that that's a correct statement, yes.

Q. All right. So, I guess to make it abundantly clear, there would never be a circumstance where you received a phone call either from someone on the ship's bridge or someone in the ship's medical center requesting your input on whether, when, and how to effectuate either an emergency evacuation or a transfer to a shoreside hospital?

MR. KRUTCHIK: Objection to form.

THE WITNESS: That's correct.

BY MR. DRAHOS:

Q. So, specifically, had you ever had any experience interacting with a cruise ship physician directly regarding medical evacuation of a crew or a guest?



A. No, my communication would have been with shipboard officers, typically in the deck department.

Q. Okay. So, did you ever physically serve onboard the cruise ship bridge?

A. As an officer or as a member of the shoreside management?

Q. I'd be shocked if you told me you were an officer, but let's just be clear. You've never served as an officer onboard any cruise line vessel, correct?

A. That is correct, not as a licensed officer.

Q. All right. So, now, in your role as an, we'll just call it administrator, did you ever work onboard a cruise ship bridge?

MR. KRUTCHIK: Form.

THE WITNESS: During both my roles both at Carnival Corporation and at Cunard, I would perform audit activities that required me to be on the bridge. Whether it was reviewing bridge team management or auditing the documentation and charts available on the vessel, I would often be on the bridge on a cruise ship.

BY MR. DRAHOS:



Q. All right, but I'm wondering if you were a lot like me in the sense that you would go onboard and visit the ship's bridge while in port, but when the ship left the dock, you're getting off the ship. So, what I'm wondering is, when you were doing these audit roles that you were doing, was the ship at sea or was it in dock?

A. Most of the time, the vessel would be at sea. We would be onboard for, you know, there were probably some times I was on the shore for three days, but typically for one of the audits, we would be onboard for five days, sometimes a full week, depending upon where the vessel was in the itinerary.

Q. Okay, well, you've got a lot more to do, it sounds like, than me. So, you've got to stay on the ship is what you're saying?

A. Yes, it was. There were visits to vessels in port, but the audits that we were tasked with developing and then executing typically required a team being onboard for at least several days, more often five to seven days.

Q. All right. And so, in that capacity as an auditor on the ship's bridge, you never had any type of active role in a cruise ship medical evacuation



or a diversion of the vessel for a medical emergency?

MR. KRUTCHIK: Form.

THE WITNESS: There may have been a medical disembark while I was onboard, but no, I was not involved in that.

BY MR. DRAHOS:

Q. Okay. So, would the same be true for a cruise ship medical center? I assume you've never worked in a medical capacity in any cruise ship medical center, right? That's the safe question.

A. That is correct.

Q. All right, so have you ever done any specific audits inside of a cruise ship medical center?

A. Yes. As I already stated, our audits-- our audits when I was at Carnival Corporation would be looking at the medical spaces as spaces in the vessel. We would be looking at them as part of our safety and environmental audits. And then when I was at Cunard and Seabourn, I would look at them to ensure compliance with the Vessel Sanitation Program, the USPH, and the CDC requirements.

Q. All right. So in other words, you're not looking at medical charts and determining whether or

not the patient care was correct?
A. That is correct. That is correct.
Q. So, what were the circumstances that prompted your departure from Carnival in 2002?
A. When I was seconded to Cunard and Seabourn, Carnival was going through one of their Department of Justice investigations that eventually led to an indictment over environmental transgressions across their fleet. Some of the--
Q. Let me stop you before you get any further into that. Is there any aspect of your departure that required any type of confidentiality provisions, or NDAs, non-disclosures?
A. There was a confidentiality agreement that was in place when I left in April 2002.
Q. Okay. Did that confidentiality agreement have any type of time parameters on it?
A. Not that I recall. And any answer that I would give here would be publicly available information.
Q. Okay. And I wanted to be sure, both in your interest and mine, that there was no involuntary disclosure of some information that may have previously been held as confidential. So now that we have that provision out of the way, whatever



the remainder of your answer is going to be is fine with me. I just didn't want to get you in any trouble, so let's get back. So, you said that there was a pending DOJ investigation that led to an indictment. How did that in any way relate to you?
A. Some of the audits that I had led had pointed out some of the environmental issues that became part of the case. So, I ended up being requested to testify by the DOJ, which I did.
Q. Okay. And how did that relate, then, to your departure from the company?
A. It basically put me in a position of testifying against the corporation, being truthful. And as Carnival came closer to establishing their environmental compliance program, which I was one of the authors of, there was an agreement between Carnival and I to part ways in a manner that was agreeable to both sides.
Q. So, are you saying that this was a mutual separation, or were you fired?
A. It was a mutual separation. There was very businesslike, professional discussions that led up to it.
Q. So, as a condition of your separation from Carnival, was there any type of an agreement in



place that you wouldn't testify against the company in any other matters going forward?
MR. KRUTCHIK: Form.
THE WITNESS: No, there was not. And when I first started doing litigation work, I did engage with an attorney in Florida to review all my documentation, ensure that I was not in a gray area.
BY MR. DRAHOS:
Q. Who was that attorney?
A. I've not been asked that question. It was five years ago, and I do not recall. Same as my previous statement, if that's important, I would be glad to look it up for you. And since we're talking about that, I did look during the break, and my recent deposition was in Harris County, Texas. That was the question that was left open earlier.
Q. Okay. So, if you've had an attorney review your contract, or your separation agreement I should say, you've had an attorney review your separation contract within the last five years, does that mean you still maintain a copy of it?
A. I would still have a copy of his opinion regarding my separation agreement, yes.
Q. Yeah, I wasn't necessarily referring to his opinion. I was referring to the actual



separation agreement itself. Do you still maintain a copy of it?
A. I am sure that I have a copy of that. I've not looked at it in five years, since providing it to the attorney for review.
Q. Okay. So, just finishing up here your employment questions. It looks like you left Carnival in 2002 and you went to ABS Nautical Systems. Is that accurate?
A. That is correct.
Q. Okay. And you were there for nine years until you left to open Ocean Ridge Maritime Consulting in 2010, is that right?
A. That is correct.
Q. Was there any gap in employment between 2009 and the opening of Ocean Ridge Maritime Consulting in 2010?
A. No, basically I left ABS on the first workday of 2010 and established Ocean Ridge Maritime Consulting pretty much concurrent to that departure.
Q. So, does that mean that you left ABS on good terms?
A. I did.
Q. And how about Transocean Offshore Drilling? Did you leave that company on good terms

as well?

A. In January of 2020, I was part of a workforce reduction due to the ongoing downturn. So, I was-- to keep it at a basic term, I was fired from Transocean in January 2020. It was due to the downturn, and our working group had been slowly dismantled over a period of a couple of years. So, it was-- even though I was technically terminated, it was not a surprise. I saw it coming.

Q. Okay. And so--

A. So, specific to your question, the person that actually terminated me I'm still on good terms with, and I'm still on good terms with the company.

Q. So, when you opened up Ocean Ridge Maritime Consulting, I see that you operated that from 2010 to 2024. And then there's Ocean Ridge Litigation Support, opened in 2024. What is the reasoning for the name change? Is there a different function that's been provided?

A. Yes, and I think you'll understand when I go through the history. So, I created Ocean Ridge Maritime Consulting in 2010 when I left ABS.

Q. Okay.

A. I worked on the BP Macondo oil spill for most of 2010 and 2011. At the end of that, I was



offered an opportunity to join both BP and Transocean, and I joined Transocean. I kept Ocean Ridge Maritime Consulting as a company. Some years it would do a little consulting work, other years it would do nothing, but I kept the company alive on paper.

Q. Okay.

A. So, I left Transocean in 2020, the company already existed. So, I just-- I kept on working under that company, Ocean Ridge Maritime Consulting. When COVID started, I had clients and I had a line of projects that would have kept me working steadily into 2021. Those projects went away. So, I pivoted over to a focus on litigation support starting in 2020. In January of 2024, I partnered with a Houston-based consulting company, and jointly, Ocean Ridge Maritime Consulting and the consulting company that I partnered with, jointly, we created Ocean Ridge Litigation Support. So, it was a new company with different ownership. Ocean Ridge Maritime Consulting still exists as a company today. It is the part-owner of Ocean Ridge Litigation Support.

Q. Okay. And so you've been retained as an expert in your capacity as an employee of Ocean Ridge Litigation Support?



A. I am an owner of Ocean Ridge Litigation Support. I am not a W-2 employee of that company.

Q. So, in other words, when you get contacted by an attorney to serve as a consultant, how do you determine whether or not you're doing so for Ocean Ridge Litigation Support or Ocean Ridge Maritime Consulting?

A. All of our litigation support work is run through Ocean Ridge Litigation Support since January 1st, 2024.

Q. Okay. And so, you told me that in 2020 was when you shifted to a litigation focus. Prior to 2020, had you still served in this litigation consulting expert witness role, or was that when you started doing that type of work?

A. While I was working with Transocean, I was working projects which gave me six months or more a year of off-time. And I did some litigation support consulting with an attorney that I had known since college. So, I had written a couple of reports prior to 2020, but it was not a primary means of compensation or a primary use of my time prior to 2020.

Q. Okay. And so, prior to 2020, approximately how often would you serve in the litigation support



consulting expert role?

A. I wrote two reports and had minor consulting roles in two or three others.

Q. So, currently today, what percentage of your time is spent in capacity as a litigation support expert witness versus a consultant unrelated to litigation?

A. For practical purposes, it's 100% now related to litigation support. Some of the work we do is consulting, but it's due to the potential for litigation.

Q. All right, and so pulling back up what was previously marked as Composite Exhibit C, your testimonial history. I've reviewed this, and correct me if I'm wrong, but it appears that in every instance since 2020 up until present day, with the exception of two cases, you've served as an expert for the plaintiff. Is that right?

A. In this list, which is just the cases where I have provided testimony, that is correct.

Q. Okay. And so, in the two instances in which you provided testimony on behalf of the defendant, one was in 2025 in the case called Sulz versus AP Steel Corporation, correct? If you can see my cursor, I've got it pointed there.

A. I can see it, yes, you're correct.
Q. All right. What was that case about?
A. That was an asbestos case.
Q. And what was your role as the expert in that case?
A. It had to do with asbestos exposure to a worker onboard an offshore drilling unit, a drillship in the 1980s.
Q. Okay. And what were you asked to do as the expert in that case?
A. I was asked to compare the statements of the plaintiff against what I knew of as operations onboard vessels in the 1980s.
Q. And was it your opinion in that particular case that the plaintiff was not exposed to asbestos onboard their client's vessel?
A. Not in the way-- I did-- I provided an opinion that his description of how he was exposed to it was not plausible.
Q. Okay. And then the other one that I saw was in 2020, the case called Cameron versus SFK. Do you see that there?
A. I do.
Q. And what was that case about?
A. That was the case of a surveyor who fell



and injured themselves off of a ladder being used on the side of a vessel as he was moving between the vessel and a fuel barge alongside it.
Q. Okay, and what was your role as the expert in that case?
A. One of the specific issues in that case was the definition of the ladder that was being used to move between the vessel and the barge. It was being referred to as a pilot ladder, which has very specific requirements for construction and use. At the time, it was not being used as a pilot ladder, it was being used as a rope ladder to get back and forth between the vessels.
Q. So, was it your opinion that the plaintiff in that case did not use the ladder correctly, or should not have been using the ladder at all for that function?
A. It was my opinion that the ladder, as it was being used, was not a pilot ladder.
Q. Okay.
A. So the very specific requirements for a pilot ladder and how it gets rigged were not applicable.
Q. So, prior to this case, have you testified as an expert witness on behalf of the plaintiff in



any matter in which a cruise line was the defendant?
A. I'm sorry, I was thinking about the answer and I lost the question.
Q. Okay. The question was, prior to this case, have you testified, either at deposition or at trial, as an expert for the plaintiff in any case in which a cruise line was the defendant?
A. No, I have not.
Q. All right. Have you consulted on behalf of any cruise line in any capacity as an expert witness since the formation of your-- or since the transition of your role as an expert in 2020?
A. I have written reports and I have been retained on other cruise ship cases. I have not provided testimony in them, though, if that's your question.
Q. Well, I understand that you were retained and issued a report in the Dennis matter, but I think-- and maybe you got lost in the legalese. What I'm wanting to know is, have you ever consulted as an expert witness on behalf of any cruise line?
A. No, I have not.
MR. KRUTCHIK: Hey, Mike, can we take a quick break, please?
MR. DRAHOS: Sure, yeah. Okay, Madame Court



Reporter, let's go off the record and we'll-- what time?
MR. KRUTCHIK: Five minutes.
MR. DRAHOS: Okay, we'll come back on at 1:05.
THE STENOGRAPHER: Okay, off the record.
(Thereupon, a recess was taken.)
THE STENOGRAPHER: Back on the record.
BY MR. DRAHOS:
Q. Okay, Mr. Nielsen, we're back on the record.
A. Yes.
Q. So, we left off while going through your testimonial history. I have two more questions about that before we move on. So, what I'd like to know is, during the course of the time that you served as an expert witness, have you ever provided an opinion in a case that involved whether or not a ship operator should have medically evacuated a passenger, or should have diverted the ship to handle a medical emergency differently than it was done?
MR. KRUTCHIK: Form.
THE WITNESS: I'm trying to recall my specific opinions from the Dennis case. That would have been the only case where there were some similarities to

this case.
BY MR. DRAHOS:
Q. Okay. So, how about in any of these cases that you've served as an expert witness, have you ever been asked to plot the ship's coordinates and provide an opinion on the feasibility of alternative transfer methods than the ones that were used by the ship operator?
A. There are similarities in the Dennis case, where I also used data from Vessel Finder to show where the vessel was at various times. I have also used Vessel Finder data on other, non-cruise line cases to show where a vessel was when the incident occurred.
Q. Okay. And so, specifically as it relates to other matters in which you used Vessel Finder to pinpoint where a ship was located, in any of those particular cases, did you ever render an opinion that the ship could have done something differently to handle a medical issue other than what had been done?
A. I have opined in previous reports regarding a vessel's decision to keep somebody onboard instead of disembarking them. Those opinions were not specific to what was used to get a person



off. Those opinions were more specific to cases where a person was kept onboard to avoid having to report a lost-time incident. These were crew issues, not passenger issues.
Q. All right. Now, how many times have you been involved in a case as an expert to address issues of whether or not an incident should have been reported, and it was not? I'm assuming you're talking about a medical incident.
A. An illness or an injury, yes.
Q. Okay.
A. Yes. Something that would have required a person seeking medical attention beyond what was available onboard. As an estimate, I would say at least six reports. I've had opinions on keeping people onboard when they should have been sent shoreside.
Q. Okay. Specifically as it relates to the opinion that-- are you telling me-- strike that. Are you telling me that in instances in which you've been involved in issues that related to whether or not the patient should have been kept onboard or sent shoreside for medical care, that your opinion was critical of the decision that was made by the shipowner?



A. Not necessarily the shipowner. More often, it would have been the captain or crew onboard.
Q. Okay. So, I appreciate your precision. Let me reword the question to make sure I get the answer I'm looking for. In the instances in which you served as an expert witness, wherein the case involved whether or not it was appropriate to keep the crew member aboard the ship as opposed to sending them shoreside for medical care, were you critical of the captain's decision in each of those cases?
MR. KRUTCHIK: Form.
THE WITNESS: I would say yes. My opinions in those cases would have been based on the regulatory requirements of how incidents and illnesses are characterized for reporting. Holding somebody on board with an injury that meets the requirements or the definition of a marine casualty or a lost-time incident instead of sending them off the vessel so that a higher level of reporting is then avoided.
BY MR. DRAHOS:
Q. All right. So, I think you told me that you've written reports, but what I'm looking for, specifically, is testimony. In any of these cases that you've identified in defendant's Composite



Exhibit C, can you point out to me matters wherein this specific issue was being discussed? So, any in here you testified?
A. You're speaking specifically of my testimony list?
Q. Yes, sir.
MR. KRUTCHIK: I object to the form of that question.
THE WITNESS: Okay. If it's okay with you, I'd like to open my report and run through that testimony list quickly.
BY MR. DRAHOS:
Q. Whatever you need.
A. I was taking your question to be toward any case that I have been retained or involved with, not specific to the testimony list.
Q. Yeah. Now I'm following up. So, you've told me about this particular type of case you've been involved in. So, now what I want to know is, have you actually testified in any of those cases?
A. Okay. If it's okay with you, I'm going to refer to that attachment in my report.
Q. Okay.
A. I think it would be easier for me to run through that than try to do it on a screen share.

Q. Okay.
A. In the review of the two pages, I cannot identify any of these that would have had that specific type of opinion in it. However, with the number of reports that I've written, I cannot state with absolute certainty that there is not one in here.
Q. Okay. Now, I'm understanding your role in those cases to be that you would come in and say that that type of circumstance warranted it to be reported.
MR. KRUTCHIK: Form.
BY MR. DRAHOS:
Q. Right?
A. Warranted that a different level of reporting be provided that would change the classification of an injury or an illness. I was not providing a medical opinion. It was once the condition was known and diagnosed-- whether or not it should have been documented or characterized as a lost-time incident, or the person left ashore, not brought back onboard and kept in their cabin for a number of days without working in lieu of reporting.
Q. Okay. Understood. And so, in any of those cases, did you also express the additional opinion



that they should have been transferred off of the vessel, and here is when and how and where it should have been done?
MR. KRUTCHIK: Form.
THE WITNESS: No, not to those specifics.
BY MR. DRAHOS:
Q. All right. So, in your testimonial history, are there any other cases you can identify for me wherein medical care that had been rendered onboard a vessel was at issue in the case?
A. Not that I can tell from just looking at the list.
Q. Have any opinions that you've ever given ever been stricken or limited by any court?
A. I have had an opinion limited.
Q. In which case?
A. I'm going back to the list so I can get you to the correct one. It's on the second page, about in the middle, Servitec Survival Products v. Fire Protection Service.
Q. Yes, sir. Okay. And what aspect of your opinion was limited?
A. This was a very unusual case because it did not have to do with an incident or an illness or an injury. It was actually a trademark infringement



case regarding life rafts and lifesaving equipment onboard vessels. And I provided an opinion regarding the impact to the industry by the actions of the defendant. My opinion was limited because I did not perform what would have been considered a proper sampling of personnel in the industry. So, I could talk about how it could cause confusion generically, but I could not state that in a broader sense that industry members would have been confused by this. It was very, very specific, and I promised never to take another trademark case because of it.
Q. All right. Let me turn the page. So, after having reviewed the records in this case, do you agree that there is a discrepancy between the various time zones and shift time entries in this case?
A. Yes, there is. And I do cover that in my report, that there were time entries in the case summary that appeared to be one hour off. And that was also acknowledged by personnel on the vessel.
Q. All right. Before we get into that, do you have any personal experience in using the SeaCare system that was used in this case by the medical staff?
A. No, I do not.



Q. All right. Do you have any experience with the SeaCare system in any degree?
A. No, I've never used it.
Q. All right. One thing I'm hoping that you can clarify for me is, what time metric did you ultimately use for your opinions in this case? Did you use the ship's time or UTC?
A. I used the times off of the ship log, the official log, in order to determine what time zone the vessel was in at any given time. And the ship log, the official ship log, references ship time to UTC. So, basically, I'm using the official ship time and UTC to determine the times in my timeline.
Q. All right. So, I think as we go here, you're going to see why it is that I have some confusion about that. Maybe as we go through the questions, I'll be able to get a little bit more clarity. So, are you then relying upon SeaCare for your factual chronology in this case? And what I mean by that is the medical chart itself, are you relying upon the medical chart to establish the factual chronology as you understand it?
A. There are times that I use in my timeline from the case summary, but where there were apparent discrepancies, I note that I believe that there was

a discrepancy and I go back to the ship time. On the log, on the ship log, they note when they changed time zones. So you can tell by any time entry what time zone the vessel was in and what the ship time was. In the case summary, where there was what appeared to be a discrepancy, I believe I note that and I tie it to ship time where possible.

Q. Okay. But that's not exactly what I'm asking. So, let me word it a little bit differently and see if we can get to where I'm going. What I want to understand is, your understanding of the factual chronology, meaning the substantive facts as they occurred, is that based entirely upon what is entered into the chart by the medical staff members in the SeaCare system?

MR. KRUTCHIK: Form.

THE WITNESS: That would be where I started, but I believe that I note where there are discrepancies and tie it back to what we know was ship time at the time.

BY MR. DRAHOS:

Q. So, all right, let's do it this way. We're going to do it through the process of elimination. Would you agree that in this case you did not review any deposition testimony from the ship physician



involved in the medical care?

A. I do not recall reviewing the deposition of the ship doctor, although I would want to verify that that is something that I did not have when I was writing the report.

Q. All right. So, we kind of went through this in painstaking detail in the first two hours of the depo, so that I would be clear when we got to this part what you've reviewed. And we went through both the materials that was provided by the Scolaro Law Firm, and we went through the materials that were identified in your search parameters that you did in your report, and --portion, either in the attachment that we attached as an exhibit or in your report is there any reference to any deposition testimony from anyone in this case, agreed?

A. I agree. My only point-- I'm not trying to bring in a new list of materials. What I would like to do, before responding to that, you know, 100% in the positive, is to look at the attachment at the end of the report to make sure that I did not have the doctor's report. I do not-- you know, in pretty much any case that I have, there's going to be a hundred different documents, and I do not recall off the top of my head every document from every case.



Q. All right. Well, let's look at it together. And you're welcome to look at the printout on your desk there if you'd like. But in looking through this, I see the complaints, answers to interrogatories, responses to requests for admissions, responses to the first request for production, and document production that was provided by Princess in this case, and then all those photographs and videos we talked about. But would you agree that nowhere within Attachment Three is there any reference to any deposition transcripts in this case?

A. Now that I look at that attachment on my report to refresh my memory, yes, you are correct.

Q. All right. So, then, we can conclude here safely that you have not relied upon any deposition testimony of the ship's doctor in supporting your opinions in the case?

A. That is correct.

Q. Okay. And would that also, then, be true that you did not rely upon any deposition testimony of either Mr. O'Malley or Mrs. O'Malley in this case?

A. That is correct.

Q. All right. So, if we don't have any



deposition testimony from any witnesses that would have been involved, what other source of information would you have, other than entries written in the SeaCare medical chart, relating to specifically what went on factually onboard the vessel involving Mrs. O'Malley's care?

A. The case summary, which is the SeaCare chart that you were talking about, and the vessel logs.

Q. Okay. And you're calling it the case summary. I'm calling that the medical chart. I want to make sure that you and I are saying the same thing when we're talking today. So, you're welcome to use case summary if that's the term you want to use. But I just want you to know that, when I'm asking you questions and I'm referring to the medical chart, that's what I'm referring to. You know what? Let's just do this. I've put up on the screen what we'll mark as Composite Exhibit G to the deposition. And is this the case summary that you're referring to, sir? It's a 60-page document with a GR14 on page one.

(Thereupon, Defendant's Exhibit G, was marked for ID.)

A. Correct. And I actually used that. I did

just reference page 21 in my report. There's a footnote in there: "Timeline based on case summary GR14 through 73 unless noted otherwise."
Q. Okay.
A. So, yes, I used the term case summary because that's the heading of these 60 pages right there in the upper left. But I understand if you refer to it as a chart, we are talking about the same document.
Q. So, you're welcome to refer to your report there in your lap or on your desk if you want. I'm going to pull it up on the screen. And what I want to do now is understand your chronology in this particular case. So, I pulled up page three, and under the heading "Assignment and Opinion Summary," do you see that there?
A. Yes, I do.
Q. All right. Now, I'm assuming as part of your process that, when you review these charts or these reports before you sign them, you specifically review them for accuracy?
A. Yes.
Q. All right. Which would mean, in this particular case, before you sign the report, you most definitely reviewed this opinion summary to



ensure it was accurate?
A. I wrote the opinion summary, so yes.
Q. All right. So, in reviewing the opinion summary here on page three, it indicates-- I'm looking at the paragraph that starts on February 6th, 2024.
A. Yes.
Q. The case summary has a triage time of 18:33, and in parentheses you put "6:33 UTC," and then "5:33 p.m. ship time." Correct?
A. Correct.
Q. So, according to your review of this case, the triage would have occurred at that time, right? 6:33 p.m. UTC, 5:33 p.m. ship time?
A. Correct. And I believe that this is one of the entries where there was an issue with the clock in the SeaCare system.
Q. Okay. What I'm wanting to know is, what did you land on as your final time? You're saying she was triaged at 18:33 UTC, right? 5:33 p.m. ship time?
A. My sentence there, my statement there, is that the case summary, the chart, has a triage time of 18:33, which would have been 6:33 p.m. I believe that in the chart, this is one of the entries that



is off by an hour. So, it would have been 5:33 ship time, local time.
Q. Okay. And then you continued here, next paragraph: "Mrs. O'Malley was released from the clinic at 20:57," which you've stated is 8:57 p.m. UTC or 7:57 p.m. ship time, right? So, you're of the opinion in this case that that is the time that Mrs. O'Malley would have left the medical center, correct?
A. That's my understanding, yes.
Q. All right. And the next sentence states here, "The case summary shows that the next contact with Mrs. O'Malley was at 23:48," which you calculated as 11:48 p.m. UTC or 10:48 p.m. ship time. Correct?
A. That is correct.
Q. All right.
A. And in the paragraph prior to the ones that we just looked at, I do explain that times are shown as they appear in the case summary, with the corresponding actual ship time highlighted in yellow. So, those three entries, my understanding is those are three of the entries where the SeaCare system was incorrect. And I do go into more information regarding the use of UTC later in the



report.
Q. All right. Now I'm looking at page 25 of your report, sir, which appears to be a track of the itinerary of the ship on the night in question, is that correct?
A. This is the night of 6th February, correct?
Q. Okay. So, the red circles that you have marked there, are you referring to 6:00 p.m. UTC, 6:00 p.m. ship time? What entries are referred to there in those times that you have spotted?
A. These are all ship times starting with shortly after departure from Los Angeles.
Q. Okay. So, what you're saying then is you're using the highlights, the ship time for these particular entries, right? So, in other words, it would have been UTC 10:00 p.m. / 9:00 p.m. ship time for the fourth circle there on the chart?
A. No, no. These data points are from Vessel Finder, and they can be tied directly to UTC. There's no relevance of these, or there's no tying of these times to the SeaCare system. These are the actual times of the data points provided by Vessel Finder. So, they are the data points provided from the vessel Automatic Identification System.

Q. All right. Let me ask it again, then, to make sure I got it. What you're saying, then, is these vessel points on this exhibit, or on this page 25 of your report, are UTC times that you're using? That is the ship was located at 9:00 p.m. UTC?
A. No, 9:00 p.m. local ship time.
Q. Okay. I am going to read that transcript back in hope that I just didn't get it because of the way you answered. Hopefully, we can do it again. So, let's just use the first one, the first circle there at 6:00 p.m. Is that where you're saying the ship was located at 6:00 p.m. UTC or 6:00 p.m. ship time?
A. 6:00 p.m. ship time, that's approximately an hour and a half after it left Los Angeles.
Q. Okay. So, the circles are ship time, then?
A. That is correct.
Q. Okay. Now, where in this graphic, specifically page 25, is the MRCC borderline? You know what I'm referring to when I say that?
A. I do. I do not have it marked, other than being able to look at the map and knowing where California ends and Mexico begins. I could approximate it.
Q. Okay. Why don't you approximate it for me?



Where are you approximately stating the MRCC borderline is on your page 25 graphic?
A. It would have been approximately 10:00 p.m. The intent of this was not to show that specific borderline, so I don't have that. I could have blown this up and shown it if I felt that that was an important reference to my opinion.
Q. Okay. And in fairness to us both, I want to make sure that I understand your answer. So, what you're saying is, on page 25 of the graphic that's depicted there in your report, that MRCC line would be approximately where the 10:00 p.m. circle is located?
A. I would say within 15 minutes of either side of that, yes.
Q. Okay. And would you agree that nowhere within this report do you provide an opinion on the operational capabilities of the United States Coast Guard by way of helicopter or speedboat? I should say rescue boat.
A. I refer to the Coast Guard bases in San Diego. I do not break it down by the number or type of assets that they have.
Q. I appreciate your answer, but I'm taking it one step further. Would you agree that nowhere



within your report did you provide an opinion as to what the operational limits would have been by way of distance of the United States Coast Guard?
A. That specific piece of information, in my opinion, is not relevant to my opinion that the vessel could have diverted to one of these ports.
Q. Okay. And I appreciate that, we'll get to that in a second. But are we in agreement that in this particular case you do not provide an opinion as it relates to the operational capacity of the United States Coast Guard?
A. That is correct.
Q. Okay. And while we're on that subject, let's go to Captain Miller's report. Specifically, you said opinions three through seven either supported-- or I think you said supported your opinions in this case.
A. Correct.
Q. Opinion three of Captain Miller's report is that a United States Coast Guard helicopter would not have responded to the Emerald Princess, even if it was within range given the ship location. So, are you saying that in this particular case you're in agreement with Captain Miller in that regard?
A. My report does not recommend a helicopter



evacuation. So, his opinion, I agree with it, and that's why I did not put in a medical evacuation by helicopter as a plausible or reasonable way to get her off of the vessel.
Q. All right. And then also, Opinion Four of Captain Miller's report is that a small boat transfer option anywhere along the coast of Southern California or Northern Baja California, given sea conditions, would not have likely occurred in this case. Are you of the same opinion?
A. Could you finish reading that opinion? I believe there's another half-sentence.
Q. I know, I was paraphrasing, so let me see if I left something out. Okay, let me just read it again. Opinion Four is, "Had a MEDEVAC transfer been considered in the late-night, early-morning hours of February 6th through 7th by way of a small boat transfer anywhere along the coast of Southern California or Northern Baja California, given the sea conditions, that would not have been likely to occur unless the Emerald sailed to sheltered waters in or very near a port. The rough seas for a small boat over any significant distance that night would have placed O'Malley at greater risk."
A. My opinions call for the diversion or the

potential diversion of the vessel, and the diversion of the vessel would put it very close into port, or within the breakwater, or to the dock. I do not assume to know which of those three scenarios would be the best, so I agree with the majority of this opinion. You would not send a small boat out in bad weather, you would bring the cruise ship in near the port.
Q. So, do you also agree that, in this particular case, your report did not reference the weather at all?
A. My report does not go into the weather conditions, you are correct.
Q. All right. And so, is that because you did not review or investigate the weather on the night in question?
A. I did review the weather throughout the entire three days, because the shipboard official log has got a lot of detail on weather and sea state, and all weather is local, so the ship log gives it at the vessel's location, not in a broader area. If it had been calm seas and calm winds, I would have added in the potential for a helicopter transfer. It was intentionally left out of my report because of the weather. I just-- I did not state



that. I did not think that that was relevant.
Q. Why didn't you offer that in your report as an opinion. "Hey, look, helicopters not available because the weather is bad"? Why didn't you put that in there?
A. I put in my report that my opinion is that the vessel could have earlier returned to LA or later diverted to San Diego or Ensenada. I did not feel that it was necessary to talk about things that I didn't think were a possibility at that point.
Q. All right. So, are we then both in agreement that, in this particular case, neither a helicopter nor a small boat transfer would have been appropriate for Mrs. O'Malley?
MR. KRUTCHIK: Form.
THE WITNESS: Helicopter I will agree with you. For a small boat transfer, the cruise ship would have had to move into either the harbor or close inland in order to safely effect the transfer.
BY MR. DRAHOS:
Q. All right, and we'll get to that in a second. But let me just go back and make sure. It sounds like you're in agreement with Captain Miller, though, that a Mexican naval boat traveling out to sea and rendezvousing with the Emerald and taking



Mrs. O'Malley and transporting her back to shore would not have been a feasible option, other than what you're saying is that the ship was in the harbor already? The cruise ship?
A. I would agree that for the cruise ship to maintain its course and the Mexican Navy vessel come out would not have been plausible. However, diverting into Ensenada, whether it's just outside the breakwater, just inside the breakwater, I do not provide an opinion on how close they would have to get. But Captain Miller agrees with me that a small boat transfer would have been possible, the ship would have had to have been very close into port or in port. I'm agreeing. I don't-- the weather that night is clear that there were high winds and high seas. You do not know what the weather was immediately outside the breakwater, immediately inside the breakwater, so I do not assume to know which would be best. But consistent with Captain Miller's report, the cruise ship would have to divert, move in close to port.
Q. Okay. And we'll let Captain Miller express his opinions in the case, I'm here really just to ask about yours.
A. Absolutely.



Q. Okay. So, if there's one thing I'm taking away from this deposition today, it is that you and I both have tried to be as precise as possible with our words, and so I want to ask you about certain word choices you decided to make in this case. And it particularly has to do with the headings you were telling me about, and your proofreader making sure they're all consistent. On page 24 of your report, and you're welcome to turn the page there, and let me know when you're there.
A. I'm here.
Q. Okay. So, you state here in Opinion Number One, "despite conditions requiring advanced medical care and immediate medical evacuation." I assume that's your word choice?
A. That is.
Q. All right. Would you agree that you are not qualified to determine what conditions require advanced medical care?
A. In that opinion, I go into where that-- where that wording is derived from, and the bottom paragraph, according to plaintiff's complaint, the seriousness of Mrs. O'Malley's condition and need for an immediate medical evacuation were known. So I do make the statement that that information is

coming from the plaintiff's complaint.
Q. Okay, and I'm going to move to strike your answer as non-responsive and ask it again. So, I'm not looking for you to parrot allegations in the plaintiff's complaint. What I'm looking for is a concession on your part that you are not qualified to determine what conditions require advanced medical care?
A. I would not make that determination on my own, no. I'm not a doctor.
Q. Nor are you qualified to determine when an immediate medical evacuation would be clinically warranted?
A. Correct.
Q. Okay. So, can we both agree here today, for the sake of brevity, that you are not going to be opining at trial that Mrs. O'Malley presented with a condition at any point in time that required advanced medical care or immediate medical evacuation?
MR. KRUTCHIK: Form.
THE WITNESS: If I were to be asked a question regarding when the need was known, I would be able to refer to statements from both doctors, but no, I wouldn't-- I would not come up with that



determination on my own.
BY MR. DRAHOS:
Q. Okay. And when you authored this opinion, you did not have any doctor's opinion available to you, correct?
A. That is correct.
Q. Okay. And then the same would hold true, then, for whether or not a patient is stable for a medical evacuation? You would agree that you are not qualified to render that opinion either?
A. That is correct.
Q. Okay. So, I want to then ask you for clarity as to your methodology in this case. Specifically on page 24 of the report, you indicate here in the last paragraph, I can pull it up on the screen if you want me to, but it looks like you're looking at it.
A. I have page 24 in front of me.
Q. Okay. So, on page 24, the last paragraph, you state, "According to the plaintiff's complaint, the seriousness of Mrs. O'Malley's condition and need for an immediate medical evacuation were known by shipboard medical staff by approximately 6:30 p.m. on February 6th." You see that there?
A. I do.



Q. All right. And you would agree, as we've already stated, that you're not opining in this case that she did have a medical condition that required the need, right?
A. I am relying on the information provided by other documents. This is not my medical assessment.
Q. All right. Well, then, the only basis upon which you would have to support that sentence would be the plaintiff's complaint, right?
A. That is correct, and that's reflected in the footnote specific to that sentence.
Q. All right. As you sit here today, you can't say specifically what medical criteria would have warranted an immediate medical evacuation at 6:30 p.m., right?
A. Correct.
Q. Okay. But in this particular case, you provided a scenario in which the ship would have responded at 6:30 p.m. in a different manner than it actually did, right? A hypothetical, so to speak.
MR. KRUTCHIK: Form.
THE WITNESS: I point out that, using the known vessel position and time, there were medical disembarkation options at that time.



BY MR. DRAHOS:
Q. Okay. And so the scenario, though, the hypothetical that you posed had the ship responding at 6:30 p.m., correct?
A. In that opinion, I put forward two possibilities. That if her condition was determined to require disembarkation at that earlier time, there were certain options. If it was at a later time, the later time at 11:00 p.m. that evening ship time, there were different options.
Q. Yeah, I get that. And we've been doing so well here today, so if you'll answer the questions, I'm going to move on to that part. But what I want to confirm for me is that you have provided a hypothetical scenario in which the ship responds at 6:30 p.m. in a different manner, which you're concluding would have resulted in Mrs. O'Malley returning to Los Angeles in two hours, right?
A. Correct.
Q. All right. And you would agree, though, that in that scenario, applying your methodology would result in the ship responding in a different way without any time for evaluation in the ship's medical center itself?
A. I do not-- I do not put in that it would

take so many minutes to evaluate or further evaluate her condition.
Q. Right.
A. So I am agreeing with you. I am going by the time frame of 6:30, without taking into consideration that it may have been a few minutes later, a few minutes earlier, or even, you know, a half-hour later.
Q. Right, but--
A. It wouldn't change-- it wouldn't change the opinion, it would not change the options that were available.
Q. Okay. But in order for this hypothetical scenario to have occurred the way you've posed it, that would then mean that, at 6:30 p.m., the ship would have to turn around and head back to Los Angeles in order to have returned within two hours.
A. In my report, I state approximately two hours for the Emerald Princess to return to Los Angeles, or three and a half hours to continue south and divert into San Diego.
Q. Right.
A. It is-- it is an approximate time, it's based on vessel speed, it's based on vessel position. I know what the speed is of the vessel at



every one of those data points. I know the total distance it's traveled and how long it's taken, and approximately two hours if the decision was made at 6:30.
Q. All right, and I think we're saying the same thing. I just want to be sure. You did not factor in, though, within that two hours, time for the ship medical staff to evaluate her? What you're saying is, at 6:30, if it turned around, it could head back in within two hours.
MR. KRUTCHIK: Form.
THE WITNESS: Yes. If the ship-- if that decision was made at 6:30, it would take approximately two hours. If the decision was made later, the timeframe does change.
BY MR. DRAHOS:
Q. Okay, so moving on, then, to page 26. I'm sorry, not page 26, page 24 in Opinion Number One. First paragraph, second sentence. Are you with me?
A. I am.
Q. Okay. You state, "By approximately 10:00 p.m. on February 6th, 2024, Mrs. O'Malley was showing signs of a serious condition requiring advanced medical care not available on the Princess." That was your sentence, correct?



A. Correct.
Q. Okay. Would you agree with me, as we've discussed before, you're not qualified to determine whether or not at 10:00 p.m. Mrs. O'Malley was showing signs of a serious condition requiring advanced medical care not available on the Princess?
MR. KRUTCHIK: Form.
THE WITNESS: I would utilize the statements of others for that.
BY MR. DRAHOS:
Q. Which you did not have available for you at the time of this report, correct?
A. Further on, on the same page, I reference the plaintiff's complaint.
Q. Okay. What is the medical basis that you're relying upon to opine or to offer that sentence that, by approximately 10:00 p.m., Mrs. O'Malley showed signs of a serious condition requiring advanced medical care not available on the Princess?
A. I would have to go back and take a look at the complaint to see the way it's worded in there, to see if I paraphrased or used the exact wording.
Q. Okay.
A. A footnote on that sentence would have



clarified things. I agree with that.
Q. Okay. But would you also agree that that sentence is inconsistent with your opinions in this case that you've already offered?
MR. KRUTCHIK: Form.
BY MR. DRAHOS:
Q. So, for example, Mr. Nielsen, you're stating on page 24 of Opinion Number One that, by approximately 10:00 p.m., Mrs. O'Malley was showing signs of a serious medical condition. Yet, on page three, in your summary section, you don't have the medical staff getting called until 11:48 p.m. UTC, or 10:48 p.m. ship time. Agreed?
A. You are correct.
Q. All right. So, would you agree, then, that that sentence is inherently contradictory with your opinions in the case?
MR. KRUTCHIK: Form.
THE WITNESS: I do not believe so, because on page 26, I refer to it as 11:00 p.m. on the evening of 6th February, 2024. So, my time on page 24 may be mistakenly written as 10:00 p.m. But again, I would want to go back and see if I used that number from the complaint. But then, when I went through the case summary and realized it was actually 11:00

p.m., that later in the same opinion, I do have the same-- I do have the correct time. And the-- so the-- if that is a-- it's an inconsistency. If it's an inconsistency in the documentation, I should have footnoted it. If I was incorrect and have my time off by an hour, I do correct it in the same opinion, so I do not believe that it-- that it impacts the validity of the opinion.

BY MR. DRAHOS:

Q. Well, I don't want to leave here without understanding what you're saying. So, are you telling me that that's a typo, and that it should say, "by approximately 11:00 p.m.," or are you saying that there's some conversion that is throwing it off? What is your position in this case as to that particular time that you're saying Mrs. O'Malley's condition warranted different action than what was taken?

A. One of the times is incorrect. I would have to look at the complaint to see if that 2200 time was pulled from there and I didn't catch it as being incorrect, or whether it was a conversion issue, or whether I just totally screwed up and have a time entry in the report wrong. But it does not affect, in my opinion, it does not affect the



validity of the three-page opinion and the supporting information in the summary.

Q. All right. So, you're saying that you can't determine that as you sit here today? That's what you're telling me?

A. I would-- I would want to take a few minutes and find out why it's that way, and then, if it was something that should have been footnoted or noted as a wrong entry, that would have clarified it. As we sit here today, I agree with you, I've left two times for the same event in an opinion without explaining why they're different.

Q. Okay. And if you're saying that they would not matter to your conclusion, I want to understand what that means. So, in looking at the graphic here on page 25, are you saying that whether or not Mrs. O'Malley presented to the ship medical center at 10:00 p.m. or 11:00 p.m., the action should have been the same as what you're concluding? Is that what you're telling me? It wouldn't have made a difference?

A. If it was 10:00 and not 11:00, it makes the diversion even more favorable. On page 26, I calculate my diversions based on the later time. So, if I have made the same-- if I've made the error on



page 26, and it was actually an hour earlier, it works in the favor of a medical disembarkation or a diversion to one of those two ports. That's why I am saying that, if this is an error, then the error, if corrected and the time is moved up an hour, makes a diversion even more possible.

Q. Okay. And I appreciate that you want to be an advocate for the plaintiff, but on page 26 and page three, in both of those instances, you use 11:00 as the timeframe, right?

A. Correct.

Q. All right. So, does it stand to reason then that page 24 is a typo and you should have put 11:00 as consistent with the rest of your report?

A. There's one of two possibilities, I should have put 11:00 without any-- any footnote, or, if I got that-- if it does say that in the complaint, then I should have a footnote stating that the complaint has a wrong time statement in it.

Q. Okay. And again, for purposes of clarity, the 11:00 that we're referring to is 11:00 UTC, or 11:00 ship time?

A. These-- the times in the opinions are ship times unless noted otherwise.

Q. Okay.



A. And I do on page 21, just to clarify that, I do put a statement in there that, "Timeline is based on case summary unless-- and unless noted otherwise, all times are converted to ship time," and I give the UTC conversions for the three different days. So, if there is a time in the report that's not clarified otherwise, it is the ship time.

Q. So, let me go back to this sentence on page 24 that we were talking about. So, we've already agreed that you don't have the qualification to independently determine whether or not a patient has a serious enough condition to require being transferred off of the ship. But I also want to know about the second half of this sentence wherein you state she required advanced medical care not available on the Princess. Do you agree, as you sit here today, that you do not have the qualification to determine what care is appropriately to be rendered on the ship, versus care that can only be rendered in a shoreside hospital?

A. I would agree that I would not-- I would not independently come to that conclusion.

Q. Okay. Now, similarly to what we talked about before, do you agree that, in the hypothetical scenario that you've posed here, at this particular

timeframe when Mrs. O'Malley returns to the medical center, you have not provided any time for the medical staff to actually evaluate her?
MR. KRUTCHIK: Form.
THE WITNESS: That is correct.
BY MR. DRAHOS:
Q. All right. Now, in the scenario that you have posed, it's my understanding, and you've said it more than once now, so it's pretty clear to me, that what you're saying is the transfer option that should have been used was diverting the vessel either to San Diego or Ensenada, correct?
A. That's consistent with the statements in my report, yes.
Q. Okay. And you told me that you went to some websites to determine what ports were located where and what their capabilities were?
A. I knew from knowledge, just my own knowledge, what the cruise ports are in northern Mexico and southern California, so I knew that-- I didn't have to research and see if San Diego or Ensenada were the cruise ports, I knew that.
Q. Okay.
A. Excuse me, I knew that. I went to the websites to see if there was more information



regarding specific capabilities, what they had, you know, what they have at those ports.
Q. So, how many berthing stations are available at the San Diego port for a cruise ship the size of the Emerald Princess?
A. They have-- I know they have two separate cruise terminals. I do not know how many ships, currently, they can-- they can fit there.
Q. Do you have any idea what the berthing station capacity was on the night in question? In other words, do you know whether or not there were any ships ported there at the time?
A. Typically, in the U.S. cruise ports, the ships are in from early morning to anywhere, 4:00 to 6:00 in the evening, so at nighttime, the cruise berths are typically empty. So, even if there was an overnight, which does occasionally happen, there would be cruise docks available. However, in my opinion, I do not specify whether or not they have to go to a dock, or if they've met-- or if they're met close in the harbor by a boat, so the availability of a cruise berth was not critical to the opinion.
Q. Okay. So, does that mean that you can't tell me, specifically, how many cruise berths were



available on the night in question? If at all?
MR. KRUTCHIK: Form.
THE WITNESS: I did not take that into consideration in the opinion, because I do not state that they would have to go to a cruise berth.
BY MR. DRAHOS:
Q. Okay. So, you've told me, then, that what you're relying upon is that there would be a boat transfer at some location close in the harbor, correct?
A. What I just stated is I do not specify whether it would require the vessel physically tying up to the cruise pier, or to a cargo pier, or to be met by a boat just off the pier, or just inside the harbor, or just outside the harbor. I do not get into that level of specificity. That would have to be determined by the vessel and the shoreside facilities, the shoreside providers.
Q. All right. Do you agree with me that, in order for the cruise vessel to come within close proximity to the port, specifically, the harbor, a pilot would be required?
A. Pilots are typically required before entering any port, yes.
Q. All right. And then if, under this



hypothetical scenario you posed, there would be a transfer to a boat in the harbor, that also would require somebody to captain that boat, whether it's a pilot or otherwise, right?
A. Typically it wouldn't be a pilot, small boats like that would not have a pilot. But obviously would have to have a licensed captain for the type of boat. Plus, for a transfer like that, you would typically have some type of medical personnel in attendance, either from the vessel or from the shoreside.
Q. Okay. Specifically as it relates to pilots, would you agree that, in this particular case, you did no research or investigation to determine what the availability was-- whether or not there were pilots available on the night in question, either in Ensenada or San Diego?
A. Specific to San Diego, it's a 24-hour port. I did not believe it was necessary to determine the availability of pilots because there are vessels going in and out of there 24 hours a day. No, I did not look into the availability of pilots in Ensenada.
Q. So, you're saying that there was a cruise ship pilot capable of transferring that ship into

the harbor on a 24/7 basis in San Diego?
A. Pilots are typically not specific to the type of vessel. A harbor pilot, whether it's San Diego or Fort Lauderdale, may bring in a container ship today and a cruise ship tomorrow.
Q. All right. Well, if they are doing that type of thing, what research, if any, did you perform to confirm that there was a harbor pilot available to do this transfer during the date and time that you posed in your hypothetical scenario in San Diego?
A. I did not do that analysis to determine that a pilot would be available. That would-- that would all have to be looked at during the decision being made to come in close to shore, or into the harbor, or to the dock.
Q. Okay. And specifically as it relates to Ensenada, you would agree that, in order for the ship to pilot into the harbor in close enough proximity that a small boat transfer could be safely performed, that would require the cooperation of Mexican authorities?
A. Yes, absolutely.
Q. All right. And what research, if any, did you do as it relates to what the policies and



procedures are for the Mexican Port Authority to accept emergency transfers like the type you're proposing?
A. It's known, I was able to determine quickly, that medical disembarkations into Mexican ports do happen. I also looked into that previous case in other Mexican ports. The vessel would not have to go through an entire customs and immigration check, because nobody else would be getting off and it would not be sending anything ashore other than the injured party, or taking on any stores. So, there would be-- there would be the requirement for communication and probably paperwork. I did not look into how many pieces of paper it would take in order to effect that transfer.
Q. All right. So, in other words, you've looked into whether or not it's happened before, but what was required in order to effectuate that transfer, you specifically don't know, because you did not review the policies and procedures of the Mexican authority, port authority, correct?
A. I did not review Mexican Port Authority policies and procedures, but I have already stated that, whether it was San Diego or Mexico, there would be logistics considerations that would have to



be determined. And that would be-- that would be determined based on the weather, the paperwork required, the availability of the different logistics platforms, the size of the boat they had, and the availability of pilots to be there then or two hours later. There are unknowns that, because the vessel did not go there, we do not know exactly how long it would have taken, and whether or not they would have added time on.
Q. Well, you have opined in this case that, had the ship diverted, it would-- at this, well, where you put 10:00, and I'm not sure if it's 10:00 or 11:00 based upon your testimony, but either way, you've posed the scenario in which the ship would have not only been to San Diego, but that Mrs. O'Malley would be in a hospital in San Diego by 1:00 a.m., correct?
A. That's based on the approximate time that it would have taken to get back to San Diego. And just to ensure there's no confusion, on page 26, the time calculations that I do are based on 11:00, so if there's any confusion between page 24 and 26, the calculations are clearly done on page 26 based on 11:00 p.m.
Q. Okay, thank you for that clarity. So, as



it relates, though, to Ensenada, would you agree that you don't know how many berthing stations-- first of all, do you know how many berthing stations are available in Ensenada for a cruise ship?
A. No, I do not.
Q. And do you know how many, if any, were available on the night in question?
A. No. And I would give the same answer as I gave earlier. I also don't know how many cargo berths would be available that a cruise ship could pull up to, which is why I talk about a diversion without specifying exactly the final details as to how to do the medical disembarkation.
Q. Okay. And particularly as it relates to Ensenada, you also did not do any research and therefore cannot testify that there was specifically a number of pilots, or even small boats, available to do a transfer in Ensenada on the night in question?
A. Correct.
Q. So, this hypothetical scenario in which you framed the ship acting in a different manner at 11:00 p.m., how are you getting Mrs. O'Malley into a hospital in San Diego by 1:00 in the morning?
A. The calculations are based on 11:00 a.m.--

I'm sorry, 11:00 p.m. the Emerald Princess being approximately 35 miles southwest, which would be less than two hours to get back to San Diego. I have lived in San Diego, San Diego has got hospitals accessible nearby the port, multiple hospitals, so if one wasn't suitable for her needs, there are others. I am approximating the two hours.

Q. Okay. Have you ever effectuated, or had any role in effectuating, a medical transfer in the Port of San Diego in your career?

A. In San Diego, no.

Q. How about Ensenada?

A. No.

Q. Okay. And again, you have estimated here that Mrs. O'Malley, had the ship acted differently at 11:00 p.m., could have been delivered to a hospital in Ensenada by 2:00 a.m. How did you-- how did you get to that conclusion?

A. By estimating the diversion time to Ensenada as three hours.

Q. So, in other words, you're calculating the ship speed and how quickly it could travel a certain distance in time?

A. Correct.

Q. But you're not accounting for regulatory



issues, communication issues, or coordination issues with the port?

A. That is correct. And could that have been in there for clarity? Yes, it could have been. It would have cut out a bunch of these questions right now, and I do understand that. However, at the bottom of that opinion, I make the statement, "by not-- by not diverting to any of these three ports delayed Mrs. O'Malley's access to shoreside care by about 36 hours." So, if both of those estimates took twice as long, the bottom sentence of that is still in excess of 30 hours. So, I think that we're kind of splitting hairs here. If the decision had been made to divert and disembark her, the intent of the opinion is to state that there is considerable time saved.

Q. I don't think we're splitting hairs at all, Mr. Nielsen, but we'll let the jury decide that. Okay. So, let's-- let's go to Opinion Two. And in Opinion Number Two, what you've indicated here is that Princess Cruise Lines and Carnival Corporation policies delegate the decision to disembark the patient solely to the ship's doctor, which you believe to be in conflict with the ISM Code. Did I summarize that opinion correctly?



A. Yes, you have.

Q. Okay. And so, you specifically state that that's violative-- violates the ISM Code because the cruise lines can't delegate the master's responsibility for the safety of the passengers onboard the ship, right? That's your rationale for that?

A. Correct.

Q. What evidence do you have you can point to that that was actually done in this case?

A. I point to, in this opinion, Carnival's own policy, and then I support it with the lack of any indication that the captain was involved in any of the decision-making until sometime on the 7th--

Q. All right.

A. The day after her admission into the hospital.

Q. Do you know who the captain of this ship was? The Emerald Princess?

A. No, I do not.

Q. All right. Do you know whether or not the captain of the Emerald Princess had any medical knowledge, training, or experience whatsoever?

MR. KRUTCHIK: Form.

THE WITNESS: I know, as captain of the vessel,



they are going to have medical training. Not to the point of being a doctor, though.

BY MR. DRAHOS:

Q. All right. And you would agree that no captain that you've ever experienced in any aspect of your career has ever had a medical degree, or could call themselves a doctor in addition to a captain?

A. There may be one out there, but I do not know of any personally.

Q. All right. So, wouldn't you agree, Mr. Nielsen, in your experience, that there is a requirement for someone with medical expertise to make the decision as to whether or not the condition of the patient that they're seeing requires care that can't be provided on the ship, that that's not something a captain can do?

A. My statements in my opinions-- and a little bit of background, Opinion Two and Opinion Three started out as one opinion, I felt there was enough information there, enough differentiation, to separate them into two separate opinions. Because there are other policies within Carnival and Princess that require collaboration between the medical team and the captain.

Q. Okay.

A. However, the highest-level policy clearly states that it's up to the doctor to determine whether or not a person has to be medically evacuated. My point is that, had there been communication with the captain, the same rationale that the captain is not a doctor, the doctor has no idea as to what are the available diversions at any given point. So, had the-- if the policy was, and I state this in my Opinion Two or Three, if the policy was for the doctor to alert the captain at the earliest indication that somebody could need to be evacuated, that would be more consistent with their sub-procedures, and that would have given the captain the opportunity to say to the doctor, "If we don't do it now, we're waiting 36 hours."

Q. I see, ironically, I feel like you're the one that's now splitting hairs. And so, let me dive into-- into that as you're stating it. So, first of all, let me just go back to my question before. Are you aware of any scenario in this case wherein the captain felt that it was medically necessary to have Mrs. O'Malley transferred off the ship, and that was overruled by the doctor?

MR. KRUTCHIK: Form.



THE WITNESS: No, and I do not state that in my report.

BY MR. DRAHOS:

Q. All right. So, in your report, though, what you do state on page four. I'm going to put up on the screen. You state, "Princess Cruise Lines and industry policies call for the evacuation of passengers when care needs exceed those available onboard, including the requirement by the Cruise Lines International Association to facilitate the evacuation of seriously ill or injured patients when deemed necessary by a shipboard physician." Correct?

A. Correct.

Q. All right. So, CLIA's official position would be that a passenger needs to be evacuated when it's deemed necessary by a shipboard physician.

A. Correct.

Q. All right. And are you saying that CLIA's policy, that an evacuation needs to be performed when deemed necessary by a shipboard physician also violates the ISM Code?

A. The difference is, this is an industry working group, very high-level statement that is then taken by each member company of CLIA and put into their policies and procedures with details



specific to their operations. So, this statement by CLIA is not the regulation. It's industry guidance which is then put into the safety management system of each individual company, which then makes it part of the ISM Code, which makes it a regulation.

Q. Okay. So, I'm looking at HESS procedures, MED 3103, which we'll mark as Exhibit-- I think I'm on H. And specifically, I'm referring to "2.1, Considerations for Patient Referral." And it states, "The decision to refer a patient ashore is the responsibility of the ship's treating doctor and should, where possible, be approved by the senior doctor." Do you see that there?

(Thereupon, Defendant's Exhibit H, was marked for ID.)

A. I do.

Q. All right. Is this the language that you're referring to in support of your opinion that the policy violates the ISM Code?

A. Could I see the top of that page, to see the specific opinion again-- the procedure again?

Q. Yes, it's 3103, "Patient Referral."

A. On my Opinion Number Two, in footnote 59, I specifically refer to MED 3104.

Q. Okay.



A. This is 3103. This is an archived version of the patient referral.

Q. Well, did you review 3103 when you reached this opinion that it was violating the ISM-- the policies were violating the ISM Code?

A. I do have 3103 listed as one of the policies that I have, that I was provided and did review, yes.

Q. Okay. So, do you agree with me that the decision to refer a patient ashore is a clinical judgment?

MR. KRUTCHIK: Form.

THE WITNESS: It is a-- it is a clinical judgment from the-- from the medical perspective, yes.

BY MR. DRAHOS:

Q. Okay. And so, would you agree that the language of 3103 is consistent with CLIA's declaration that a patient should be transferred ashore when deemed necessary by the ship doctor?

MR. KRUTCHIK: Form.

THE WITNESS: Yes, in-- but we can't take-- we can't take one line and look at it in a vacuum. And that is not the document that I footnote as having the statement regarding "the decision to disembark a

patient is the responsibility of the ship's treating doctor."

BY MR. DRAHOS:

Q. Well, you and I can agree on that statement probably most of all of what you've said today. So, in looking at MED 3104 A5, which you refer to and actually, specifically, embed into your report, this is a workflow disembarkation that's part of the policies and procedures for Princess Cruise Lines, correct?

A. Correct.

Q. Okay. And if we follow through that flowchart, does it not specifically request the ship doctor to review options with the captain?

A. Yes, as a step in the entire process. Yes, it is there, and I note that it's there.

Q. All right. And doesn't it also require that the doctor and captain agree on the disembark option?

A. This all assumes that the captain is aware of the need to disembark somebody. In this specific case, my opinions are that the captain was not given the opportunity to say, "We have options now, we don't have options tomorrow."

Q. Okay, but I'm not-- I'm going to get to



that in a second.

A. Okay.

Q. But what I'm getting to is, you're saying that the policies violate the ISM Code because it delegates the authority to the ship's doctor to effectuate a transfer. But you're only reading one policy and splitting a hair inappropriately, are you not?

MR. KRUTCHIK: Form.

BY MR. DRAHOS:

Q. Because if you look at the totality of the policies and procedures, they specifically call for the doctor to confer with the captain, and the two of them must be aligned in their thinking that the patient can be safely transferred ashore without risk to any passengers or crew. Isn't that the totality of the policy as it exists?

MR. KRUTCHIK: Form.

THE WITNESS: When you look at them all together, once the decision is made to disembark somebody, then the captain gets involved. But 3103 that you were pointing out and 3104 that I referenced in my report are both very clear that the decision to disembark is made by the captain-- I'm sorry, the decision to disembark is made-- is the



responsibility of the ship's treating doctor. Nowhere in that statement in 3103 or 3104 does it say in collaboration with the captain to ensure that all diversion, disembarkation, MEDEVAC possibilities and options are discussed.

Q. Isn't that what I just put up on the screen specifically says? Let me put it back up.

A. Yep.

Q. Which, if I don't have it attached as an exhibit, I will, I think we are on H, right? So, what do you think is the purpose, in reading this document, for the senior doctor to review disembark options with the captain? Why do you think that that's the policy?

(Thereupon, Defendant's Exhibit H, was marked for ID.)

MR. KRUTCHIK: Form.

THE WITNESS: When we look at this one, that's-- it's not necessarily the third step, because there are-- there's many steps in each of these boxes. This is stating that the disembark options with the captain are not discussed until after there's been calls with the Health Operations Center, after the doctor makes the decision that a medical disembarkation is necessary. My point, and I state



it in my report, if their policy stated, at the earliest indication of the need for a medical disembarkation, the captain is looped in so that all options are known to the doctor and the captain, you would have gone away with this scenario where we have options now. If you don't tell me until tomorrow, we're not going to have options until the day after. There's a 30-plus hour difference in that decision-making process.

BY MR. DRAHOS:

Q. All right. I'm trying-- I'm trying to understand that and then apply it to the case. So, what you're saying is the captain should be notified at the earliest indication, right?

A. Correct.

Q. Okay, that would mean that the doctor has already made a judgment that it is clinically warranted, right? There has to be a chicken before the egg, right?

MR. KRUTCHIK: Form.

THE WITNESS: The doctor would be faced with a situation where, "I may need to medically disembark this person, the policy says let the captain know now, because he knows what our options are, not me."

BY MR. DRAHOS:

Q. All right. How do you know that that wasn't done in this case?
A. There is no indication in any of the documentation that I reviewed, either before writing this report or after writing it, that indicates that the captain was advised anytime before midday on the 7th.
Q. Okay, so what you're saying is you haven't seen any evidence, but you can't state definitively whether or not it occurred?
MR. KRUTCHIK: Form.
THE WITNESS: Had the doctor been-- I'm sorry, had the captain been informed and there was any change made to the operation of the vessel, that would have been noted in the deck log. The case summary, I would expect that it would have notification or notice or notes regarding outside consultations, and there was nothing of the sort in either the deck logs or the-- or the chart in this case.
BY MR. DRAHOS:
Q. What you're stating is, the absence of a specific entry in the ship log, or the absence of a specific note in the medical chart, means it didn't happen, that's what you're saying?



A. That was my opinion, and since issuing the report, that opinion has been supported by others'-- other reports.
Q. All right. And I think what you've said is there wasn't-- there was not a communication until midday February 7th, right? That's when the communication occurred?
A. That's the earliest indication of communication occurring.
Q. All right. As you sit here today, don't you agree that you're not qualified to opine on whether or not Mrs. O'Malley had a medical condition prior to that that would have warranted the captain's involvement?
A. I would not independently come to that conclusion, no. I'm not a doctor.
Q. All right. So, what you're saying is-- you're not-- you're not saying that the captain was never informed, what you're saying is you believe the captain wasn't informed timely enough?
A. There are indications that he was looped in at some time on the afternoon of the 7th, so, yes, you-- you are correct, he was involved in communication on the afternoon of the 7th, not on the 6th.



Q. Okay. And so, in understanding Opinion Number Three, when you state that the crew didn't follow policies and procedures, what you're stating is they didn't follow the policies and procedures because they didn't notify the captain soon enough, that's what you're saying?
A. Correct.
Q. All right. And explain to me how that is not a medical opinion?
A. The documentation that I had to base my opinions on at the time of writing the report were the ship logs, the medical chart, the complaint. As we've already discussed, I did not have depositions.
Q. Okay.
A. The reports since support my opinion that he was not advised or informed in a timely manner.
Q. So, you're saying reports that you've received since the time you signed this report support your opinion. But wouldn't you agree that, on 24th, 2026-- June 24th, 2026, when you offered that opinion, you did so without any medical expertise to rely upon?
MR. KRUTCHIK: Form.
THE WITNESS: That's correct. Other than-- other than the documents that we've already discussed,



yes.
BY MR. DRAHOS:
Q. The documents that we've already discussed being the plaintiff's complaint?
A. And the chart or summary, and the vessel logs, correct.
Q. Yeah. But your interpretation of the chart would require a medical opinion, you can't look at the chart and say, "Oh, this is when there was an emergency that they should have notified the captain about," right?
MR. KRUTCHIK: Form.
THE WITNESS: That is correct. I would not independently come up with a medical opinion, correct.
BY MR. DRAHOS:
Q. Okay. All right, those are all the questions I have for you, then, Mr. Nielsen. Thank you very much for your time.
MR. KRUTCHIK: I just need a couple of minutes.
MR. DRAHOS: Sure.
MR. KRUTCHIK: And then I'll ask some follow-up.
MR. DRAHOS: Okay.
THE WITNESS: Let me say thank you, also. I appreciate your professionalism.

MR. DRAHOS: Yes, I enjoyed meeting you, and I'm sure we'll cross paths many times in the future.

CROSS-EXAMINATION

BY MR. KRUTCHIK:

Q. Mr. Nielsen, you would agree with me that it's reasonable for an expert such as yourself to rely upon the reports and opinions of other experts, correct?

A. Yes.

Q. Okay. And there was a discussion with Mr. Drahos regarding the times that you relied upon for your opinions, that around, I believe it was 6:30, and then approximately 11:00 or 11:30. Do you recall that?

A. Yes.

Q. Okay. And then, after you authored your report, you received the reports from-- excuse me. You received a report from Dr. Gomez, correct?

A. Correct, that was one of three reports I received.

Q. Okay. And Dr. Gomez, to your understanding, is the plaintiff's shipboard medical expert, correct?

A. Yes.

Q. Okay. I just want to take a quick look at



Dr. Gomez's report. Now, in your report, you opined that Mrs. O'Malley had a life-threatening condition at approximately 6:30 p.m., correct?

A. Correct.

Q. Okay. And then, after reviewing the report from Dr. Gomez, his report confirmed that that was the timeframe when she presented to the medical center with a life-threatening condition. Is that accurate?

A. I would not state that I can remember his report word-for-word, but yes, he talks about her condition at 6:30 and then again at her second presentation later.

Q. Okay, so if I-- I'm going to put something up on the screen here. I'm looking at page four, and let me just back up. I'm going to mark as Plaintiff's Exhibit Number One Dr. Gomez's report. Sorry, give me one second. I just lost it. Okay. And on page four, I highlighted the text that said 17:33 is the arrival time of Mrs. O'Malley to the medical center. Is that accurate?

(Thereupon, Plaintiff's Exhibit 1, was marked for ID.)

MR. DRAHOS: Objection to form.

BY MR. KRUTCHIK:



Q. Let me rephrase. The timeframe that you have, or that Dr. Gomez has indicated in his report of Mrs. O'Malley arriving at the medical center is at 17:33, correct?

A. Correct, and that's consistent with my timeline on page three of my report.

Q. Okay. And then, going onto page five of the report, Dr. Gomez then says in the highlighted text that at 18:36, Mrs. O'Malley, according to the chart, has a physical examination by Dr. Batista-- Bautista, and the examination notes "moderate dehydration and tachycardic-- a tachycardic regular heart rate." Dr. Bautista documents a diagnosis of "volume depletion and urinary tract infection, site not specified." Do you see that?

A. I do.

Q. And that is consistent with the opinion in your report, correct?

MR. DRAHOS: Objection to form.

THE WITNESS: I use 6:30, his statement is 6:36, but yes, it's within-- it's within six minutes.

BY MR. KRUTCHIK:

Q. Let me rephrase it. The opinion of Dr. Gomez that you received after you had authored your report that Mrs. O'Malley, according to the records,



presented to the medical center at 18:36 with-- and had moderate dehydration and volume depletion and a urinary tract infection supports your opinion that at approximately 18:30 there was a medical issue or problem with Mrs. O'Malley, correct?

MR. DRAHOS: Objection to form.

THE WITNESS: Yes.

BY MR. KRUTCHIK:

Q. Okay. Now, before I go further, isn't it reasonable for experts such as yourself to rely upon the written record of what is documented as the times of when things occurred?

MR. DRAHOS: Objection to form.

BY MR. KRUTCHIK:

Q. In other words, what's memorialized in writing is what the individuals are memorializing as of the approximate time when they occur. Is that your understanding?

A. Yes, it is. And having been in the maritime industry my entire career, I realize that ships move between time zones, and therefore you have to be a little bit more careful when taking times as written or as provided.

Q. And if it's not written or evidenced, then isn't it fair to say that it may not have occurred?

MR. DRAHOS: Objection to form.
THE WITNESS: I would agree with that, yes.
BY MR. KRUTCHIK:
Q. Okay. So, now looking at page six of Dr. Gomez's opinion, and there's a few entries here, but there's a discussion here, and it's highlighted, that prior to 22:30, there was a 911 call by Mr. O'Malley reporting his wife had collapsed, correct?
A. Correct.
Q. And then the next entry says that there was a physical extraction of Mrs. O'Malley from the shower floor to the wheelchair, and then conveyed to the medical center, correct?
A. Correct.
Q. Okay. And then, going down to 22:50, the patient was readmitted to the medical center according to Dr. Gomez, correct?
A. 22:50, correct.
Q. Right. And then going down to, now, page 21, Dr. Gomez opines that-- bear with me for one second. It says here that, "upon being discovered collapsed and readmitted to the medical center at 22:50, Mrs. O'Malley was in profound, life-threatening shock, physiology consistent with septic shock." That's what Dr. Gomez says, correct?



MR. DRAHOS: Objection to form.
THE WITNESS: Yes.
BY MR. KRUTCHIK:
Q. And the timing of Dr. Gomez's opinion at approximately 22:50 is consistent with your opinion that at around 22:00 was when Mrs. O'Malley presented to the medical center, correct?
A. I have, on page 26 of my report, which I am referring to. I say "at 11:00 p.m., 2300." So, I don't specify 22:50, I specify-- take it to the top of the hour, 2300, when calculating approximate times and distances for a diversion.
Q. Okay. And we're-- so, there seems to be a slight difference with respect to about a little under an hour, correct? Between your opinions? And as they are support-- strike that. There's about an hour inconsistency, or less than an hour inconsistency, potentially, with your opinions, but that's minimal, wouldn't you agree?
MR. DRAHOS: Objection to form.
THE WITNESS: We earlier spoke during questioning that I have an inconsistency in my times, where on page 24 I reference 10:00 p.m., page 26 I reference 11:00 p.m. But my calculations for vessel diversion are done based on 11:00 p.m., which is consistent with his report of 22:50 of her in profound, life-threatening shock.



BY MR. KRUTCHIK:
Q. Okay. And regardless of that minor inconsistency, you would agree with me that your opinion is that, had the ship diverted around those times, at approximately, I think it was 20:30, and then 2200 or 22:50, Mrs. O'Malley could have potentially been at a medical center in San Diego more than 30 hours before she was ultimately disembarked, correct?
A. That is correct. I put-- I put down vessel diversion options for both 6:30 that evening and for 11:00 that evening.
Q. And those opinions are consistent with those that you saw in Dr. Gomez's report after you had authored your report?
MR. DRAHOS: Objection to form.
THE WITNESS: That is correct.
BY MR. KRUTCHIK:
Q. So, would you agree with me, then, that your opinion, regardless of-- strike that. You would agree with me that your opinions, based upon the material that you relied upon when you drafted the report, and that you received after the report, all support or are consistent with your opinions as far as the timing goes?



MR. DRAHOS: Objection to form.
THE WITNESS: Both medical reports are consistent with that 22:50 timing. Both medical experts make the statement that-- and again, I'm not going to try to cite them word-for-word, but to paraphrase, they both state that she was in shock and required immediate attention at that 22:50 timeframe on the evening of the 6th.
Q. And are you also referring to Dr. Parejo's opinion?
A. Correct. The two-- the two doctor reports that I reviewed, Parejo and Gomez.
Q. And you're aware that Dr. Parejo is actually the defendant's expert, right?
A. Yes. Yes, Gomez was the plaintiff's expert, if I remember correctly.
Q. Okay. Sorry, bear with me for one moment. Do you recall Mr. Drahos asking you about whether you saw any evidence that the captain was involved in the evacuation at an earlier time?
A. Yes.
Q. Okay. And you indicated that there is an absence of evidence indicating that he was involved

at an earlier point, correct?
A. Correct. The earliest indication that I have seen, which was later supported by Captain Miller's report, is log entries on the afternoon of 7th February.
Q. Okay. So, it is fair to say that if there's no evidence supporting that the captain was involved earlier, then it didn't happen, is that accurate?
MR. DRAHOS: Objection to form.
THE WITNESS: That was-- that was my opinion. That is my opinion in the report. That there is no indication of any involvement by the captain prior to that.
BY MR. KRUTCHIK:
Q. Which is what Captain Miller also testified to or opined in his report, correct?
MR. DRAHOS: Objection to form.
THE WITNESS: His opinions, his conclusion, I believe, support my opinion.
MR. KRUTCHIK: Okay. I have no other questions, thank you for your time.
MR. DRAHOS: Okay, Mr. Nielsen, you can read the transcript to make sure it was taken down accurately, or you can waive that, right?



THE WITNESS: I would like to read.
MR. DRAHOS: Okay, Madam Court Reporter, I'm going to order.
MR. KRUTCHIK: I will take a copy, please.
(Thereupon, the deposition was concluded at 2:49 p.m.)



CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA )
):SS
COUNTY OF MIAMI-DADE )

I, Chancelor Merritt, do hereby certify that I was authorized to and did stenographically report the deposition of Gerald Nielsen, that a review of the transcript was requested, and that the foregoing transcript, is a true record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney or counsel of any of the parties', nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I hereunto set my hand and affix my official seal of office this 21st day of July, 2026.

Chancelor Merritt, Stenographer



CERTIFICATE OF OATH

STATE OF FLORIDA
:SS
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that GERALD NIELSEN personally appeared before me and was duly sworn.

He produced a Driver's License as identification.

WITNESS my hand and official seal this 21st day of July, 2026.

CHANCELOR MERRITT
Notary Public in and for
the State of Florida
My Commission No. HH454299
Expires: 10/20/27

July 27, 2026

Gerald Nielsen
C/O Laurence Krutchik, Esquire
Law Office of Laurence M. Krutchik, P.A.
7450 SW 172nd Street
Palmetto Bay, FL 33157
Email: lmk@lmklegal.com

RE: O'MALLEY V PRINCESS

Mr. Nielsen,

The above transcript is ready for review. The witness (The witness/You) should read the testimony to verify its accuracy. If there are any changes,(the witness/you) should note those with the reason on the attached Errata Sheet.

(The witness/You) should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to US Legal Support and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If (the witness/you) fail(s) to do so, the transcript may be used as if signed.

Sincerely,

Chancelor Merritt, Stenographer
US Legal Support



ERRATA SHEET

CASE: O’MALLEY V PRINCESS

DATE:

WITNESS NAME: Gerald Nielsen

PAGE/LINE CHANGE/CORRECTION REASON

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

____________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_________________________

(Witness name)