# Expert Witness Report

**Prepared By:**
Gerald Nielsen
Ocean Ridge Litigation Support LLC
24 June 2026

**Prepared For:**
Thomas Scolaro
Scolaro Law

**Regarding:**
No. 1:25-cv-24748
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

-----------------------------------------------------

ANN O'MALLEY
vs.
PRINCESS CRUISE LINES, LTD.

-----------------------------------------------------

OCEAN RIDGE
LITIGATION SUPPORT

19219 Katy Fwy, Suite 320, Houston, TX 77094
Gerry@OceanRidgeTeam.com 1-832-233-8563

Ex. C

**Table of Contents**


| | |
|---|---|
| Section 1 – Assignment and Opinion Summary | **3** |
| Section 2 – Author's Qualifications | **6** |
| Section 3 – Methodology | **7** |
| Section 4 – Document Review and Research | **8** |
| Section 5 – Incident Summary | **9** |
| Section 6 – Opinions and Analysis | **24** |
| Section 7 – Conclusions | **32** |
| Section 8 – Attachments | **34** |

Attachment 1 – Current Resume and Past Testimony, Gerald Nielsen
Attachment 2 – Ocean Ridge Litigation Support LLC Rate Sheet
Attachment 3 – Documentation provided by Scolaro Law

## Assignment and Opinion Summary

Gerald Nielsen, through Ocean Ridge Litigation Support LLC, has been retained by Scolaro Law to provide expert opinions regarding the case involving Ann O'Malley vs. Princess Cruise Lines Ltd. According to court documents, this is Civil Action Number 1:25-cv-24748 in the United States District Court for the Southern District of Florida, Miami Division.

Opinions contained within this report were developed following a review of relevant documents, materials, and testimony, thorough independent research, and application of expert knowledge, education, and training developed over forty years in the maritime industry. The opinions within this report are the author's own.

This case concerns the events involving Ann O'Malley beginning on 6 February 2024. On this date, Ms. O'Malley was a paying passenger on the Princess Cruise Lines vessel *Emerald Princess* with her husband. The *Emerald Princess* was on a cruise, departing from Los Angeles, CA, on 6 February 2024 and scheduled to end in Fort Lauderdale, FL, on 21 February 2024.[1]

NOTE: The case summary contains known time discrepancies with several time entries being one hour different from actual ship time. In the next two paragraphs, times are shown as they appear in the case summary, with the corresponding actual ship time highlighted in yellow. The Summary section provides a detailed explanation of UTC and the cause of these discrepancies.[2]

On 6 February 2024, the day of departure from Los Angeles, California, Ms. O'Malley woke from a nap feeling unwell and presented herself at the shipboard medical center after Mr. O'Malley called using the shipboard 911 system. The case summary has a triage time of 18:33 (6:33 p.m. UTC – 7 hours) (5:33 p.m. ship time) and states that "Guest called 911" and "Patient attends clinic for shaking"; the clinic visit was categorized as a non-urgent illness.[3]

Ms. O'Malley was released from the clinic at 20:57 (8:57 p.m. UTC -7 hours) (7:57 p.m. ship time) and was returned to her cabin with the use of a wheelchair.[4] The case summary shows that the next contact with Ms. O'Malley was at 23:48 (11:48 p.m. UTC -7 hours) (10:48 p.m. ship

[1] Defendant's responses to plaintiff's first RFP (Request #2)
[2] See Summary section of this report (page 14) for an explanation of UTC and inconsistencies in the time reporting on board the *Emerald Princess*
[3] Case Summary (GR000014)
[4] Case Summary (GR000070)

time) when her husband again called the shipboard 911 number to report, "My wife has collapsed in the bathroom, I can't move her or get her up."[5] She was returned to the clinic in a wheelchair by shipboard paramedics after losing consciousness in the shower.[6]

Ms. O'Malley remained in the medical clinic on the *Emerald Princess* until approximately 1300 (1:00 p.m. UTC -6 hours) on 8 February, when she was medically disembarked from the *Emerald Princess* by boat in Cabo San Lucas, Mexico.[7]

It is the author's opinion, as documented within this report, that Ms. O'Malley was under the care of medical staff on board the *Emerald Princess* from 6 February 2024 until her medical disembarkation on 8 February 2024. Princess Cruise Lines and industry policies call for the evacuation of passengers when care needs exceed those available on board, including the requirement by the Cruise Lines International Association (CLIA) "*To facilitate the evacuation of seriously ill or injured patients when deemed necessary by a shipboard physician.*"[8] Princess Cruises did not comply with the requirements of the ISM Code. They did not take the necessary steps to promptly medically evacuate Ms. O'Malley on 6 February 2024, even though evacuation was feasible, thereby denying Ms. O'Malley the opportunity for prompt shoreside intervention. The *Emerald Princess* medical crew did not adhere to pertinent Carnival Corporation and Princess Cruise Line policies and procedures in the time leading up to the medical disembarkation of Ms. O'Malley. Specifically:

1. Despite conditions requiring advanced medical care and immediate medical evacuation on 6 February 2024, the *Emerald Princess* continued away from accessible advanced care in California and Northern Mexico. This failure to promptly disembark Ms. O'Malley denied her the opportunity for prompt shoreside hospital evaluation or treatment.
2. Princess Cruise Line and Carnival Corporation policies that delegate the decision to disembark a patient solely to the ship's doctor conflict with the ISM Code. Commercial vessels operating internationally are required to abide by the ISM Code, which explicitly designates the captain as the overriding authority for safety

[5] Case Summary (GR000037)
[6] Complaint paragraph 28
[7] Case Summary (GR000071)
[8] CLIA Health Policy (www.cruising.org/health)

decisions, which Princess Cruise Line and Carnival Corporation's current procedures do not follow.

3. Carnival Corporation and Princess Cruise Line have multi-tiered policies and procedures regarding passenger care and medical disembarkation. The crew on the *Emerald Princess* did not follow established policies and procedures for the medical disembarkation of patients.

It is the author's understanding that discovery related to this case is ongoing, and additional information, including deposition testimony, may become available after the issuance of this report. The author may supplement or amend this report should additional information become available and provided for review.

## Author's Qualifications

The author's career in the Maritime and Offshore Industries began in 1980. He has over 40 years of experience in the maritime industry and more than 25 years of experience in incident and accident investigations. During his career, he has earned the following professional certifications, licenses, positions, and degrees:

- Bachelor of Science – Marine Engineering Systems – USMMA
- USCG Licenses – Chief Engineer of (Limited Oceans) of Motor Vessels of any Horsepower, Chief Engineer of Uninspected Motor Vessels of any Horsepower, First Assistant Engineer of Motor Vessels of any Horsepower, and Third Assistant Engineer of Steam Vessels of any Horsepower
- Lieutenant Commander - United States Naval Reserve – Honorable Discharge
- Classification Society Marine Surveyor
- Certified International Safety Management (ISM) Code Auditor
- Certified International Standards Organization (ISO) 9000 Auditor
- Certified International Standards Organization (ISO) 14000 Auditor
- Cruise Line Designated Person Ashore (DPA)
- Cruise Line Maritime Audit Director
- Cruise Line Safety and Environmental Management Director
- Maritime Consultant and Project Manager
- Certified Project Management Professional (PMP)
- Level II Certification – Nondestructive Evaluation and Qualified Welding Inspector
- Graduate coursework - M.A. Legal Studies – University of Illinois Springfield

In addition, the author has completed training in the following areas:

- OSHA 10 and OSHA 30 – Construction Safety and Health
- Ship Casualty and Incident Investigations – Lloyd's Maritime Institute
- Shipyard Competent Person
- Marine Firefighting and Emergency Training
- Non-Destructive Evaluation and Weld Inspection
- FEMA Emergency Management
- TapRooT® Root Cause Analysis
- OPITO Offshore Emergency Training
- OPITO Offshore Industry Safety Training
- OPITO Helicopter Underwater Escape Training

## Methodology

The author has been formally trained as a marine surveyor, management system auditor, and incident investigator, and applies this training during each case review. This training includes certification as an International Organization for Standardization (ISO) internal and lead auditor and as an International Safety Management (ISM) Code lead auditor.

The author's methodology provides a consistent and structured approach based on the industry standard in the ABS *Guidance Notes on the Investigation of Marine Incidents.*[9] The ABS guide was developed to provide an effective and efficient approach for investigating marine incidents of any magnitude (minor to major, including near-misses) and applies to vessels and facilities both ashore and at sea. The ABS guide provides a structured approach to investigating incidents and near-miss events. The guide also aids in identifying and documenting root causes as required by the ISM Code.

This consistent methodology requires the author's review of the case-specific facts, knowledge of applicable regulations, and experience in maritime industry practices. The author undertakes the same high-level steps in each case to ensure a thorough and consistent review:

- Gather and review available information, including events and conditions
- Determine the sequence of events leading to the incident
- Identify and analyze conditions and contributing events
- Identify and analyze causal factors[10]
- Identify corrective actions (both implemented and missed)

The ABS Guide provides detailed instructions regarding Root Cause Analysis (RCA). The additional effort and analysis required to identify root cause(s) aid in identifying, documenting, and trending incident causes as required by the ISM Code.[11] RCA is typically not required to identify contributing events and causal factors.

The author's education in auditing against industry standards and experience with maritime industry practices were applied to the facts of this case to develop the opinions in this report.

---

[9] ABS Guidance Notes on The Investigation of Marine Incidents (Feb 2014)
[10] A causal factor is an event or condition for which steps should be taken to reduce or mitigate its occurrence.
[11] ABS Guidance Notes on The Investigation of Marine Incidents (Feb 2014) Pg. iii

## Document Review and Research

The author used several sources to prepare this report, including documentation provided by Scolaro Law, physical and digital personal library resources, and materials in the public domain. Documents provided for the author to review are listed in Attachment 3 of this report.

Other materials used by the author in the research and preparation of this report include:

- Electronic Code of Federal Regulations (www.ecfr.gov)
- Cruise Lines International Association (CLIA) website (www.cruising.org)
- Carnival Corporation website (www.carnivalcorp.com)
- Princess Cruise Line website (www.princess.com)
- Cruise Ports Guide website (https://cruiseportsguide.com)
- Port of San Diego website (https://www.portofsandiego.org)

## Incident Summary

This case concerns the events involving Ann O'Malley beginning on 6 February 2024. On this date, Ms. O'Malley was a paying passenger on the Princess Cruise Lines vessel *Emerald Princess* with her husband. The *Emerald Princess* was on a cruise, departing from Los Angeles, CA, on 6 February 2024 and scheduled to end in Fort Lauderdale, FL, on 21 February 2024.[12]

Opinions contained within this report were developed following a review of relevant documents, materials, and testimony, thorough independent research, and application of expert knowledge, education, and training developed over forty years in the maritime industry. The opinions within this report are the author's own.

The following is an overview of the entities, persons, and events relevant to this case and to the author's development of opinions.

### Carnival Corporation

Founded in 1972 with the formation of Carnival Cruise Line, Carnival Corporation & plc has innovated and evolved the vacation experience through a dynamic portfolio of world-class cruise lines. Carnival Corporation & plc provides unparalleled cruise vacations through a world-class portfolio of cruise lines and a global fleet of more than 90 ships visiting over 800 ports and destinations around the world.[13]

Carnival Corporation is the owner of the cruise ship *Emerald Princess*.

### Princess Cruise Line

Princess Cruises is an American cruise line owned by Carnival Corporation. The company's headquarters are in Santa Clarita, California, and it is incorporated in Bermuda. As of 2025, it is the sixth-largest cruise line by net revenue. It was previously a subsidiary of P&O Princess Cruises. The line has 17 ships cruising on global itineraries marketed to both American and international passengers.[14]

[12] Defendant's responses to plaintiff's first RFP (Request #2)
[13] Carnival Corporation website (www.carnivalcorp.com)
[14] Princess Cruise Lin website (https://www.princess.com/about-princess)

On their website, Princess Cruise Line states:

*Our medical centers are primarily intended to provide acute care for illness and accidents that may occur while on vacation and are not intended to provide long term care for patients with chronic illnesses or as a substitute for regular health care.*

*Our intention is to:*

- *Provide quality maritime medical care for guests and crew members aboard our ships.*
- *Initiate appropriate stabilization, diagnostic and therapeutic maneuvers for critically ill or medically unstable patients.*
- *Support, comfort and care for patients onboard.*
- *Facilitate the timely medical evacuation of patients, if appropriate.*

Princess Cruise Line is the operator of the cruise ship *Emerald Princess*.

**Cruise Ship *Emerald Princess***

The *Emerald Princess* is a cruise ship built in 2007 at the Fincantieri Cantieri Navali Shipyard in Italy. The vessel is owned by Carnival Corporation and operated by Princess Cruise Lines. The vessel operates under a Safety Management System as required by the International Safety Management (ISM) Code. The *Emerald Princess* specifications are:[15]

- Tonnage (gross): 113,561
- Length: 951 ft.
- Width: 118 feet
- Guests (max): 3,090
- Crew: 1,200

The following is a photo of the cruise ship *Emerald Princess*:[16]

[15] Emerald Princess Fact Sheet (https://www.princess.com/news/backgrounders-and-fact-sheets/emerald-princess-fact-sheet)
[16] Princess Cruise Line website




The *Emerald Princess* has an onboard medical facility staffed by doctors and nurses. As a member of the Cruise Lines International Association (CLIA), Princess Cruise Line has committed to meet or exceed the requirements of the American College of Emergency Physicians (ACEP) Health Care Guidelines for Cruise Ship Medical Facilities, as revised October 2023.[17]

The *Emerald Princess* was operating on a 16-day itinerary that included the following ports:[18]

[17] CLIA website (https://cruising.org/clia-oceangoing-cruise-lines-policies/health)
[18] Defendant's responses to plaintiff's first RFP (Request #2)

| Date | Location | Departure | Arrival |
|---|---|---|---|
| Feb. 6, 2024 | Los Angeles, CA | 06:15 | 15:00 |
| Feb. 7, 2024 | At Sea | | |
| Feb. 8, 2024 | At Sea | | |
| Feb. 9, 2024 | Puerto Vallarta | 08:00 | 17:00 |
| Feb. 10, 2024 | At Sea | | |
| Feb. 11, 2024 | Huatulco | 08:00 | 17:00 |
| Feb. 12, 2024 | At Sea | | |
| Feb. 13, 2024 | At Sea | | |
| Feb. 14, 2024 | Puntarenas | 07:00 | 19:00 |
| Feb. 15, 2024 | At Sea | | |
| Feb. 16, 2024 | Panama Canal Full Transit | 06:00 | 18:00 |
| Feb. 17, 2024 | Cartagena | 10:00 | 17:00 |
| Feb. 18, 2024 | At Sea | | |
| Feb. 19, 2024 | George Town (Grand Cayman) | 07:00 | 17:00 |
| Feb. 20, 2024 | At Sea | | |
| Feb. 21, 2024 | Fort Lauderdale, FL | 07:00 | 15:00 |

The following screenshots show the position of the *Emerald Princess* from 6-8 February 2024, specifically:

1. Entire course of *Emerald Princess* from 1700 (5:00 p.m.) on 6 February 2024 to 1400 (2:00 p.m.) on 8 February 2024
2. Location of *Emerald Princess* at 2130 (9:30 p.m.) on 6 February 2024
3. Location of *Emerald Princess* at 23000 (11:00 p.m.) on 6 February 2024



[19]

Course of *Emerald Princess* from departure from Los Angeles at 1700 (5:00 p.m.) on 6 February 2024 (Green Flag) to arrival in Cabo San Lucas at 1400 (2:00 p.m.) on 8 February 2024 (Red Flag)

[19] AIS Data from VesselFinder.com



[20]

Location of *Emerald Princess* at 2130 (9:30 p.m.) on 6 February 2024, approximately 30 miles from San Diego, CA

[20] AIS Data from VesselFinder.com



[21]

Location of *Emerald Princess* at 2300 (11:00 p.m.) on 6 February 2024, approximately 35 miles southwest of San Diego, CA and approximately 55 miles northwest of Ensenada, Mexico.

## Time Entries on board the *Emerald Princess*

Time entries on board cruise vessels are typically made using 24-hour time and are noted relative to Coordinated Universal Time (UTC). Using 24-hour time prevents confusion between a.m. and p.m. entries, as cruise ships operate 24 hours a day. Noting UTC in time entries removes the confusion caused by crossing time zones or by the vessel keeping "Ship Time" that differs from the time zone it is in. Vessels transmit their location through mandatory equipment known as the Automatic Identification System (AIS). AIS signals include (amongst other information) the

[21] AIS Data from VesselFinder.com

vessel's position and a timestamp (in UTC). Knowing how to convert local time to UTC is critical for determining a vessel's position when reviewing AIS data.

There are conflicting time entries in the documentation reviewed by the author, and an issue in timekeeping was noted in the case summary (highlighting added by author):

DATE
Feb 6, 2024 23:40 UTC-08:00

PERFORMED BY
Sheehan, Mark Anthony PARA

NOTES
Observations taken at these times are recorded an hour later than taken, because of Seacare clinch. FEB 6, 2024 20:56 UTC-07:00, FEB 6, 2024 19:25 UTC-07:00 and FEB 6, 2024 17:45 UTC-07:00

DATE
Feb 7, 2024 00:35 UTC-07:00

PERFORMED BY
Govender, Deshan RN

NOTES
Dopamine titrated to 30ml/hr.

DATE
Feb 7, 2024 00:30 UTC-07:00

PERFORMED BY
Govender, Deshan RN

NOTES
Dopamine infusion commenced at 26 ml/hr.

DATE
Feb 6, 2024 23:06 UTC-08:00

PERFORMED BY
Sheehan, Mark Anthony PARA

NOTES
NOTE: EVEN THOUGH SEACARE CLOCK HAS BEEN CHANGED TO THE CORRECT TIME. SOME ENTRIES ARE LOGGED AN HOUR AHEAD OF ACTUAL TIME AS SEACARE SEEMS TO KEEP RESETTING ITSELF? [22]

The case summary notes on the top of the first page that the time entries on 6 February 2024 are UTC – 7 hours.[23] The vessel logs indicate that the vessel time on 6 February 2024 was UTC – 8 hours.[24] As the deck logs are the official records of the vessel and UTC-8 was the correct time for Los Angeles on 6 February 2026, the author uses UTC-8 for any time conversions of AIS data from 6 February 2024.

According to ship log entries, the *Emerald Princess* changed from UTC -8 hours to UTC -7 hours at 0200 (2:00 am) on 7 February 2024. The next time change from UTC -7 hours to UTC -6 hours occurred at 0200 (2:00 a.m.) on 8 February 2024. The *Emerald Princess* remained at UTC -6 hours until after Ms. O'Malley's medical evacuation from the vessel.

[22] GR000069
[23] GR000014
[24] GR000595-001192

**Cruise Ports – San Diego, CA and Ensenada, MX**

The *Emerald Princess* passed by the cruise ports of San Diego, CA and Ensenada, MX on the evening of 6 February 2024. Each of these ports has medical facilities and the ability to disembark passengers (and crew) in the event of a medical emergency. Specifics regarding each port include:

**San Diego, CA**[25]

San Diego has two cruise ship terminals located on San Diego Bay's Embarcadero. The primary cruise ship pier is the B-Street Pier & Cruise Ship Terminal, with a secondary pier at the Port Pavilion on Broadway Pier. Cruise lines calling at San Diego include Princess Cruises, Disney Cruise Line, Royal Caribbean Cruise Line, Holland America Cruise Line, and others. San Diego has a United States Coast Guard Station and Air Station that provides emergency medical evacuation services.[26] Shoreside, San Diego has multiple hospitals, as one would expect of a major US city.

**Ensenada, MX**[27]

Located less than 100 miles south of San Diego, and a two-hour drive away, is the cruise port of Ensenada, MX. Cruise ships dock directly at the cruise pier. Used by Carnival Cruise Line, Royal Caribbean Cruise Line, Princess Cruises, Disney Cruise Lines, and others.

Medical facilities include several hospitals and clinics. News reports show that the Mexican Navy, operating through its Coast Guard duties, will conduct medical evacuations by boat in Ensenada.[28]

**International Regulations, including SOLAS and the ISM Code**

The International Safety Management (ISM) Code is a set of global rules created by the International Maritime Organization (IMO), a United Nations agency that oversees shipping safety and environmental protection. Incorporated into SOLAS (Safety of Life at Sea) by the IMO, the

---

[25] San Diego Cruise Port Guide (https://www.portofsandiego.org/maritime/cruise-operations)
[26] Multiple examples found in USCG News including: https://www.news.uscg.mil/Press-Releases/Article/3378928/coast-guard-air-station-san-diego-aircrews-medevac-4-passengers-off-cruise-ship/
[27] Ensenada Cruise Port Guide (https://www.ensenadaexcursionsandtours.com/ensenada-cruise-port)
[28] https://ggnorth.com/2024/05/ensenada-navy-conducts-med:ical-evacuation-from-cruise-ship/

ISM Code ensures that ships are operated safely and responsibly by requiring shipping companies to have a Safety Management System (SMS). This SMS includes plans for safe ship operations, emergency preparedness, crew training, and environmental protection to prevent accidents and pollution. The IMO developed the code in the 1990s after major ship accidents, and it is mandatory for most commercial ships worldwide, including cruise ships operating on international routes.

The ISM Code requires shipowners and ship managers to implement a Safety Management System (SMS) for each vessel.[29] Section 5 (Master's responsibility and authority) of the ISM Code states:

**5.2:** The company should ensure that the safety management system operating on board the ship contains a clear statement emphasizing the master's authority. The company should establish in the safety management system that the master has the overriding authority and the responsibility to make decisions with respect to safety and pollution prevention and to request the company's assistance as may be necessary.

It is generally accepted within the maritime industry that the master's responsibility extends to all persons on board and cannot be overridden by company policy. SOLAS Chapter V, Regulation 34-1 reinforces this by stating:

***Regulation 34-1 – Master's discretion for safe navigation***

*The owner, the charterer, the company, as defined in regulation IX/1, or any other person shall not prevent or restrict the master of the ship from taking or executing any decision which, in the master's professional judgement, is necessary for safe navigation and protection of the marine environment.*[30]

**Cruise Lines International Association (CLIA)**

Cruise Lines International Association (CLIA) is "the preeminent cruise trade association, providing a unified voice for the industry and its members as the leading authority of the global cruise community."[31]

CLIA states, in their Medical Facilities policy, that:

---

[29] International Safety management (ISM) Code 2018 Edition.
[30] MSC-MEPC.7/Circular.7 – Guidance on Near-Miss Reporting – (10 October 2008)
[31] CLIA website (https://cruising.org/about-cruise-lines-international-association)

*Cruise Lines International Association (CLIA) Cruise Line Members collaborated with the American College of Emergency Physicians (ACEP) to develop and implement guidelines on cruise ship medical facilities. These guidelines, which are mandatory for CLIA oceangoing Cruise Line Members, specify that cruise ships must have at least one qualified medical professional available 24/7 for medical bay visits or cabin "house calls." Also, cruise ships must have an examination room, an intensive care room and equipment for processing labs, monitoring vital signs and administering medications. Patients requiring more comprehensive facilities or treatment are typically referred to a shore side medical facility.*

The CLIA mandatory guideline also states that the intention of the guideline is to foster the following objectives:

- To provide reasonable emergency medical care for passengers and crew aboard cruise vessels
- To stabilize patients and/or initiate reasonable diagnostic and therapeutic intervention
- To facilitate the evacuation of seriously ill or injured patients when deemed necessary by a shipboard physician[32]

Princess Cruise Lines is a member of CLIA.

**Carnival Corporation and Princess Cruise Line Policies and Procedures**

Carnival Corporation generates and issues policies and procedures that apply to all its operating brands. More specific policies and procedures are developed for each cruise brand, including Princess Cruise Lines, and incorporated into their Safety Management System. Specific policies and procedures provided to the author for review include:

Carnival Corporation

- MED-3002 First Response and Triage (Archived Revision)[33]
- MED-3101 Completing a Patient Encounter[34]
- MED-3102 Patient Admission and Discharge from the Medical Center[35]

---

[32] CLIA Health Policy (www.cruising.org/health)
[33] GR001193-001196
[34] GR000578-000584
[35] GR001197-001202

- MED-3103 Patient Referral[36]
- MED-3104 Medical Disembarkation[37]
- MED-3104-A4 Disembarkation Considerations[38]
- MED-3104-A2 Disembarkation Categories[39]
- MED-3104-A4 USCG Rescue Coordination Centers Contact Details[40]
- MED-3104-A5 Workflow for Disembarkation with Potential Operational Disruption[41]
- MED-3105 Shoreside Information Resources[42]
- MED-3701 Documentation Management[43]
- MED-3903 Medical Staff Handover and Performance Management[44]
- MED-4002 Medicines Management[45]
- MEDICO / MEDEVAC Checklist (No HESS number)[46]

Princess Cruise Lines

- HAG-MED-3104-A1 Medevac Briefing Guidance[47]
- HAG-MED-3104-A5 Guidance for Assignment of Disembarkation Risk Priority[48]
- HAG-MED-3104-A7 Disembarkation Communication Matrix[49]
- HAG-MED-3104-D1 HAGROUP Specific Procedures Requirements for Disembarkation (archived)[50]

The above policies and procedures provide details on many aspects of medical care. They are part of the larger Safety Management Systems required by international law, specifically the International Safety Management (ISM) Code.

[36] GR001203-001205
[37] GR000001-000007
[38] GR001206
[39] GR001212-001213
[40] GR001217-001218
[41] GR001214
[42] GR001207-001211
[43] GR001219-001224
[44] GR000589-000592
[45] GR001225-001232
[46] GR001215-001216
[47] GR001233-001235
[48] GR001236
[49] GR001237
[50] GR000008-000013

**Princess Medical Staff Performance Appraisals**

Princess Cruise Lines uses a form titled "Performance Partnership Form" to document appraisals of medical staff. The appraisal of Dr. Rhius dated 26 April 2024 has the following comments regarding Managing Company Resources which is counted as 20% of the appraisal:

| Managing Company Resources<br>20% of Appraisal | |
|---|---|
| Minimum of 2 Observations to be entered here based on: what the teammember did, how they did it, and how consistently they did it.<br>• Responsibly handles all assets (supplies, equipment, materials) with care to avoid damage, loss, or unnecessary waste.<br>• Displays an understanding of how the team member directly or indirectly impacts the financial success of the operations.<br>• Responsibly oversees business operations and adherence to relevant policies and procedures.<br>• Carefully monitors costs, expenditures, and inventory of all assigned departments and achieves targets within the established budget. | Meets and Sometimes Exceeds Standards |
| *Observations* | |
| Martelie is extremely mindful when looking at cost to company whether it's about doctors shoreside appointments, teleconsults, drug choices and disembarkation options. She is always taking into consideration the cost but not negatively impact the patient outcome. | |
| *Section Score* | *4.00* |

**Ms. O'Malley**

Ms. O'Malley was a 77-year-old passenger on the *Emerald Princess*. She was a United States citizen residing in Texas and joined the *Emerald Princess* in Los Angeles, California, on 6 February 2024 for a cruise terminating in Fort Lauderdale, Florida. She was accompanied by her husband, Mr. James O'Malley. At approximately 5:30 p.m. on 6 February 2024, Ms. O'Malley experienced shaking and shivering, causing her husband to call the medical facility on the *Emerald Princess*.[51] On February 8, the *Emerald Princess* diverted to Cabo San Lucas, where Ms. O'Malley was medically disembarked by boat transfer.[52]

**Timeline of 6-8 February 2024[53] (Times in ship time (UTC -8 hours)**

6 February

5:33 p.m. Ms. O'Malley attends the ship medical center for shaking and shivering.

7:57 p.m. Ms. O'Malley is discharged from the ship medical center after observation and immediately returns with wheelchair assistance due to feeling light-headed.

[51] Case Summary (GR000037)
[52] Case Summary (GR000071)
[53] Timeline based on Case Summary (GR000014-000073) unless noted otherwise, all times converted to ship time which was UTC -8 hours on 6 February, UTC -7 hours on 7 February, and UTC -6 hours on 8 February.

**Actual time of call not known:** Case Summary shows 10:54 p.m., but that does not appear to be the actual time of the call. 9:54 p.m. aligns with the remainder of the 6 February timeline entries. Mr. O'Malley calls shipboard 911, advising that Ms. O'Malley lost consciousness in the cabin bathroom. Ship Paramedic responds.

10:00 p.m. Ms. O'Malley was brought back to the ship's medical center in a wheelchair by a paramedic. Placed in an ICU bed, connected to a cardiac monitor and placed on oxygen. Nurse notes:

10:55 p.m. Noted as restless, moving a lot, and Dr. informed that staff were unable to obtain blood.

12:00 (midnight) Ms. O'Malley soiled herself while in ICU bed

7 February

All Day – Ms. O'Malley in the ship medical center the entire day

8 February

2:00 p.m. Ms. O'Malley transferred ashore after the vessel diverted to Cabo San Lucas.

The deck log for the *Emerald Princess* contains several references to a medical disembarkation on 8 February 2024, without reference to the person being disembarked by name, concluding with "casualty disembarked" at 14:08 (2:08 p.m. UTC -6 hours).[54] The deck logs do not contain any reference to communications between the bridge and the vessel hospital or discussions regarding potential medical evacuation.

It is the author's opinion, as documented within this report, that Ms. O'Malley was under the care of medical staff on board the *Emerald Princess* from 6 February 2024 until her medical disembarkation on 8 February 2024. Princess Cruise Lines and industry policies call for the evacuation of passengers when care needs exceed those available on board, including the requirement by the Cruise Lines International Association (CLIA) that "*To facilitate the*

[54] GR000696

*evacuation of seriously ill or injured patients when deemed necessary by a shipboard physician.*"[55] Princess Cruise Lines did not abide by the requirements of the ISM Code, nor did they take the steps necessary to promptly medically evacuate Ms. O'Malley on 6 February 2024, even though evacuation was viable, and denied Ms. O'Malley the opportunity for shoreside hospital evaluation or treatment. The *Emerald Princess* medical crew did not adhere to pertinent Carnival Corporation and Princess Cruise Line policies and procedures in the time leading up to the medical disembarkation of Ms. O'Malley.

It is the author's understanding that discovery related to this case is ongoing, and additional information, including deposition testimony, may become available after the issuance of this report. The author may supplement or amend this report should additional information become available and be provided for review.

[55] CLIA Health Policy (www.cruising.org/health)

## Opinions and Analysis

### Opinion #1

> **Despite conditions requiring advanced medical care and immediate medical evacuation on 6 February 2024, the *Emerald Princess* continued away from accessible advanced care in California and Northern Mexico. This failure to promptly disembark Ms. O'Malley denied her the opportunity for prompt shoreside hospital evaluation or treatment.**

Ms. O'Malley was onboard the *Emerald Princess* and under the care of the ship's medical team starting at approximately 5:30 p.m. on 6 February 2024. By approximately 10:00 p.m. on 6 February 2024, Ms. O'Malley was showing signs of a serious condition requiring advanced medical care not available on the *Emerald Princess*. Instead of immediately rerouting to San Diego, California or Ensenada, Mexico, both established cruise ports with medical facilities and disembarking Ms. O'Malley, the *Emerald Princess* continued heading away from suitable care towards its next scheduled arrival port.

Ms. O'Malley was not medically disembarked from the *Emerald Princess* until approximately 2:00 p.m. on 8 February 2024. The failure to immediately medically disembark Ms. O'Malley in San Diego or Ensenada resulted in her condition worsening on board for more than 36 hours before her disembarkation in Cabo San Lucas.

The timeline of care provided to Ms. O'Malley is outlined in the *Incident Summary* section of this report.

According to the plaintiff's complaint, the seriousness of Ms. O'Malley's condition and need for an immediate medical evacuation were known by shipboard medical staff by approximately 6:30 p.m. on 6 February 2024.[56] The following screenshots show the location of the *Emerald Princess* hourly between 6:00 p.m. and 12:00 p.m. midnight on 6 February 2024:

---

[56] Plaintiff's Complaint (filed 20 November 2025)



[57]

Had the decision been made to provide Ms. O'Malley with a medical evacuation at 6:30 p.m. on the evening of 6 February 2024, rerouting would have taken approximately two hours for

---

[57] AIS Data from VesselFinder.com

the *Emerald Princess* to return to Los Angeles or 3.5 hours to continue south and divert into San Diego.

Later on, the evening of 6 February 2024, after Ms. O'Malley collapsed in her stateroom and was taken back to the ship's medical center and admitted, options for medical evacuation were still available. At 11:00 p.m., the *Emerald Princess* was approximately 35 miles southwest of San Diego and approximately 55 miles Northwest of Ensenada, MX. Rerouting back to San Diego would have taken approximately two hours, and diverting to Ensenada would have taken approximately three hours, with minimal impact to the ship's schedule, as it was going to pass by Ensenada as part of its passage plan. Both San Diego and Ensenada are established cruise ports with medical facilities and vessels suitable for ship-to-shore medical transfers.

The decision for the *Emerald Princess* to continue its scheduled route with medical diversion to Cabo San Lucas resulted in Ms. O'Malley remaining on board until 8 February 2024.

It is the author's opinion that the decision to continue to the next scheduled port of call instead of rerouting and disembarking Ms. O'Malley in San Diego or Ensenada resulted in an avoidable delay in transferring Ms. O'Malley to a shore-side medical facility. Had the vessel returned to Los Angeles or diverted to San Diego when Ms. O'Malley's condition became known at 6:30 p.m., she could have been transferred to a shoreside hospital by approximately 8:00 p.m. in Los Angeles or 10:00 p.m. in San Diego. Had the vessel returned to San Diego or diverted to Ensenada at 11:00 p.m., she could have been transferred to a shoreside hospital by approximately 1:00 a.m. in San Diego or 2:00 a.m. p.m. in Ensenada. This course of action would have followed regulations and best practices. The decision to continue south, with an eventual diversion to Cabo San Lucas, and to transport Ms. O'Malley to a hospital from there, delayed her access to shoreside care by more than 36 hours.

## Opinion #2

**Princess Cruise Line and Carnival Corporation policies delegating the decision to disembark a patient solely to the ship's doctor conflict with the ISM Code. Commercial vessels operating internationally are required to abide by the ISM Code, which explicitly designates the captain as the overriding authority for safety decisions, which Princess Cruise Line and Carnival Corporation's current procedures do not follow.**

A cornerstone of the International Safety Management Code is the requirement for companies to develop a Safety Management System (SMS) for each vessel.[58] Section 5 (*Master's responsibility and authority*) of the ISM Code states:

> **5.2:** *The company should ensure that the safety management system operating on board the ship contains a clear statement emphasizing the master's authority. The company should establish in the safety management system that the master has the overriding authority and the responsibility to make decisions with respect to safety and pollution prevention and to request the company's assistance as may be necessar*y.

It is generally accepted throughout the maritime industry that the master's responsibility and undivided authority are essential for the safety of the ship, crew, passengers, and cargo, both at sea and in port. Companies cannot delegate this master's authority to other crew or contracted personnel.

Carnival Corporation, through its established policies and procedures, has delegated responsibility for passenger safety to the shipboard doctor, without requiring collaborative decision-making or even notification. This delegation is found in policy *MED-3104-Medical Disembarkation* that states: "The decision to disembark a patient is the responsibility of the ship's treating doctor."[59]

The delegation of this responsibility to a contract employee, the doctor, who has no maritime training or experience, conflicts with the clearly stated requirement of the ISM Code. It

[58] International Safety management (ISM) Code 2018 Edition.
[59] MED-3104-Medical Disembarkation Section 2.1 (GR000001-000007)

effectively negates the captain's ability to make decisions that are in the best interest of personnel safety.

In documentation supporting this policy, Carnival Corporation does acknowledge the need for discussion with the captain:

MED-3104-Medical Disembarkation:

Section 2.4 Medical Disembarkation Involving Significant Operational Disruption:

- Discussion with the Captain should consider relevant case information and potential disembarkation options
- The discussion details and agreed plan should be documented

Section 2.5 Communication Briefings

- Pertinent information pertaining to "disembarkation considerations" that will assist with the decision-making process should be available for discussion with shoreside personnel.

MED 3104-A2 Disembarkation / Repatriation Categories

- Category 5: If evacuation requires helicopter, boat, operational delays (logistics that would require discussion with the captain and acknowledges that boat and air transfers are possible and to be planned for)[60]

MED-3104-A5 Workflow for Disembarkations with Potential Operational Disruptions

- This section contains considerations that require communication and coordination with senior shipboard staff and shoreside resources:

[60] Category 5 disembarkations are considered a RED (most critical) Risk Priority (GR001212-001213)

MED-3104-A5 Workflow for Disembarkations with Potential Operational Disruptions




The communication delineated in these supporting documents is essential as it is the captain, not the doctor, who will understand the options available when a medical disembarkation is needed, including any immediate actions that may be taken to divert the vessel towards appropriate facilities.

Having a policy wherein the shipboard doctor is the sole decision-maker ignores the communication required, as shown in the policy excerpts above. The doctor cannot know the operational considerations that would factor into the captain's decision for the safety of a person, his crew, or his vessel.

It is the author's opinion that Carnival Corporation and Princess Cruise Lines' policies are not in compliance with the ISM Code. The policies fail to establish that the captain is ultimately responsible for the safety of all persons on board. The *Medical Disembarkation* policy and supporting workflow should mandate that the captain be notified immediately if a passenger or crew member may require medical evacuation.

## Opinion #3

**Carnival Corporation and Princess Cruise Line have multi-tiered policies and procedures regarding passenger care and medical disembarkation. The crew on the *Emerald Princess* did not follow established policies and procedures for the medical disembarkation of patients.**

Carnival Corporation has established policies and procedures covering many aspects of its medical operations. The policies and procedures apply to Princess Cruise Line vessels and may be supplemented by operating company-specific policies and procedures. In addition to documented policies and procedures, there are role descriptions for the positions of nurse, doctor, and senior doctor. The author has received and reviewed these role descriptions, in addition to the Carnival Corporation and Princess Cruise Line policies and procedures noted in the *Incident Summary* section and the previous opinion of this report.

Multiple sections of the Carnival Corporation Policies and Procedures require communication between the doctor and the vessel's captain when a medical disembarkation is necessary. When the captain was not advised of the requirement for a medical evacuation, the following policies and procedures were violated (highlight added by author):

MED-3104-Medical Disembarkation:

Section 2.4 Medical Disembarkation Involving Significant Operational Disruption:

- Discussion with the Captain should consider relevant case information and potential disembarkation options
- The discussion details and agreed plan should be documented

Section 2.5 Communication Briefings

- Pertinent information pertaining to "disembarkation considerations" that will assist with the decision-making process should be available for discussion with shoreside personnel.

MED 3104-A2 Disembarkation / Repatriation Categories

- Category 5 if evacuation requires helicopter, boat, operational delays[61]

[61] Category 5 disembarkations are considered a RED (most critical) Risk Priority (GR001212-001213)

MED-3104-A5 Workflow for Disembarkations with Potential Operational Disruptions

- This section contains considerations that require communication and coordination with senior shipboard staff and shoreside resources:




It is the author's opinion that non-compliance by Princess Cruise Line medical staff of the documented Carnival Corporation and Princess Cruise Line policies and procedures resulted in the medical condition of Ms. O'Malley not being made known to the captain of the *Emerald Princess*. Had notification of the situation been provided immediately upon understanding that a medical evacuation might be needed, the *Emerald Princess* could have returned to Los Angeles or rerouted to San Diego or Ensenada and to suitable medical facilities. Continuing to the next scheduled port prevented medically disembarking Ms. O'Malley and having her transported to a medical facility equipped to handle her condition in a timely manner, depriving her of necessary shoreside intervention for more than 36 hours.

## Conclusions

It is the author's opinion that Ms. O'Malley was under the care of medical staff on board the *Emerald Princess* from 6 February 2024 until her medical disembarkation on 8 February 2024. Princess Cruise Lines and industry policies call for the evacuation of passengers when care needs exceed those available on board, including the requirement by the Cruise Lines International Association (CLIA) that "*To facilitate the evacuation of seriously ill or injured patients when deemed necessary by a shipboard physician.*"[62] Princess Cruise Lines did not abide by the requirements of the ISM Code, nor did they take the steps necessary to promptly medically evacuate Ms. O'Malley on 6 February 2024, even though evacuation was viable, and denied Ms. O'Malley the opportunity for critical shoreside intervention. The *Emerald Princess* medical crew did not adhere to pertinent Carnival Corporation and Princess Cruise Line policies and procedures in the time leading up to the medical disembarkation of Ms. O'Malley. Specifically:

1. Despite conditions requiring advanced medical care and immediate medical evacuation on 6 February 2024, the *Emerald Princess* continued away from accessible advanced care in California and Northern Mexico. This failure to promptly disembark Ms. O'Malley denied her the opportunity for prompt shoreside hospital evaluation or treatment.
2. Princess Cruise Line and Carnival Corporation policies delegating the decision to disembark a patient solely to the ship's doctor conflict with the ISM Code. Commercial vessels operating internationally are required to abide by the ISM Code, which explicitly designates the captain as the overriding authority for safety decisions, which Princess Cruise Line and Carnival Corporation's current procedures do not follow.
3. Carnival Corporation and Princess Cruise Line have multi-tiered policies and procedures regarding passenger care and medical disembarkation. The crew on the *Emerald Princess* did not follow established policies and procedures for the medical disembarkation of patients.

[62] CLIA Health Policy (www.cruising.org/health)

It is the author's understanding that discovery related to this case is ongoing, and additional information, including deposition testimony, may become available after the issuance of this report. The author may supplement or amend this report should additional information become available and provided for review.

______________________ 24 June 2026

Gerald Nielsen Date

Ocean Ridge Litigation Support LLC