UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Miami Division

ANN O'MALLEY,

Plaintiff,

CASE NO.: 1:25-CV-24748-KMW

v.

PRINCESS CRUISE LINES, LTD.,

Defendant.

______________________________________/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT, PRINCESS CRUISE LINES, LTD.'S MOTION IN *LIMINE* TO EXCLUDE OPINIONS AND TESTIMONY OF GERALD NIELSEN AT TRIAL PURSUANT TO *DAUBERT V. MERRILL DOW PHARM, INC.***

Plaintiff, ANN O'MALLEY (hereinafter "Plaintiff"), by and through her undersigned counsel, and pursuant to S.D. Fla. Local Rule 7.1, hereby responds in opposition to Defendant, PRINCESS CRUISE LINES, LTD.'S (hereinafter "Princess") Motion in *Limine* to Exclude Opinions and Testimony of Gerald Nielsen at Trial Pursuant to *Daubert v. Merrill Dow Pharm, Inc.* [ECF No. 31], and states as follows:

## INTRODUCTION

Princess's Motion asks this Court to exclude a witness for opinions he never offered. Gerald Nielsen is not a physician, has never claimed to be one, and does not opine that Ann O'Malley was clinically in need of evacuation at any hour of February 6, 2024. He said so, repeatedly and without equivocation, at his deposition. When asked directly whether he was "not holding yourself out in this case as a medical expert," Nielsen answered, "That is correct"; asked whether he agreed he was "not qualified to offer any medical opinions in this case," he answered, "Correct." Nielsen Dep., 30:17–24. What Nielsen does offer is the thing he has spent forty years doing: reading a vessel's safety management system against the International Safety Management Code, reconstructing where a ship physically was and what ports were reachable from there, and identifying where the crew departed from the operator's own written procedures.

Princess's Motion collapses into four complaints, none of which supports exclusion. First, it attacks medical opinions Nielsen disclaims. Second, it catalogues subjects Nielsen purportedly did not research (pilot rosters, berth availability, Mexican port paperwork) and calls their absence unreliability, when Nielsen expressly declined to make those details load-bearing. *See* Nielsen Dep., 111:18–23 ("the availability of a cruise berth was not critical to the opinion"); *id*. 112:11–18 ("I do not get into that level of specificity"). Third, it seizes on a single internal time discrepancy between pages 24 and 26 of the report — an inconsistency Nielsen acknowledged, explained, and which, if corrected, only strengthens his conclusion. Fourth, it contends that Nielsen's improperly relies on his decades of experience as a mariner and in the cruise industry in formulating aspects of his opinions. These are clearly cross-examination points. They are <u>not</u> Rule 702 problems, and the Eleventh Circuit has said so.

**ARGUMENT**

**I. LEGAL STANDARD.**

Federal Rule of Evidence 702 admits expert testimony from a witness qualified "by knowledge, skill, experience, training, or education." The Eleventh Circuit applies a three-part inquiry, asking whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–50 (1999) (gatekeeping applies to experience-based testimony).

Experience alone can qualify a witness; formal credentials in the precise sub-discipline are not required. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998); *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011). And the gatekeeping function does not displace the adversary process.

Where a challenge goes to the accuracy of an expert's inputs rather than the validity of his method, the remedy is cross-examination: "[t]he identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003). "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the

evidence rather than its admissibility.'" *United States v. Barton*, 909 F.3d 1323, 1333 (11th Cir. 2018); *Rosenfeld*, 654 F.3d at 1193. "Such objections are traditionally addressed through cross-examination and presentation of contrary evidence." *Id.*

## II. NIELSEN'S QUALIFICATIONS AND THE ACTUAL SCOPE OF HIS OPINIONS.

Nielsen's maritime career began in 1980. He holds a Bachelor of Science in Marine Engineering Systems from the United States Merchant Marine Academy and United States Coast Guard licenses up to Chief Engineer of Motor Vessels of any Horsepower. Nielsen Report at 6. Most relevant here, he was among the first cohort of ISM Code auditors trained anywhere. As he explained: "I was one of the first trained ISM auditors. . . . [B]y virtue of that, I was one of the early trained ISM auditors and experts on the International Safety Management Code and what it required with regard to documented safety management systems for shipping companies and on their vessels." Nielsen Dep., 50:1–9. He was hired away from the American Bureau of Shipping by Carnival Corporation in 1997 precisely for that expertise. *Id.*, 50:12–17 ("I was hired from ABS based on my knowledge and experience with the ISM Code and how it applied to vessels.").

At Carnival, Nielsen served as Director of Maritime Audit and at Cunard and Seabourn he served as Director of Safety and Environmental Management and as the "Designated Person Ashore" — a position the ISM Code itself requires. Nielsen Report at 6; Nielsen Dep., 43:7–9 ("The DPA, Designated Person Ashore, is a position that is mandated by the International Safety Management Code."); *id.*, 45:3–46:11 (chronology of Carnival roles). He authored the safety management system for Cunard and Seabourn — the very type of document whose adequacy is at issue here. *Id.*, 47:17–48:6 ("I authored their safety management system. . . . While I may not have authored the actual wording, I was responsible for the safety management system that they were contained in."). His audit work was performed aboard ships at sea, not from a desk. *Id.*, 59:18–24 (audit activities requiring presence on the bridge); *id.*, 60:8–22 (audits typically "onboard for five days, sometimes a full week"); *id.*, 61:16–23 (audits of shipboard medical spaces for USPH and CDC compliance). He was also Carnival's point of contact ashore for non-routine medical evacuations, involved "once every six weeks, twice every three months." *Id.*, 55:22–56:6; 57:13–16.

Against that background, Nielsen offers three opinions, all of them operational: (1) that diversion to Los Angeles, San Diego, or Ensenada was physically available on the evening of February 6, 2024, and was not taken; (2) that Carnival's and Princess's policy[1] vesting the disembarkation decision solely in the ship's doctor is in tension with the ISM Code's allocation of overriding authority to the master; and (3) that the crew did not follow the operator's own written procedures because the captain was not looped in. Nielsen Report at 4–5; 24–31. None of the three requires a medical degree.

## III. NIELSEN OFFERS NO MEDICAL OPINION, AND PLAINTIFF DOES NOT INTEND TO ELICIT ONE.

The bulk of Princess's Motion is directed at language in the report referring to "conditions requiring advanced medical care and immediate medical evacuation." That language describes the premise Nielsen was given, not a diagnosis he made, and he conceded the point without a fight at every turn:

> Q. What I'm looking for is a concession on your part that you are not qualified to determine what conditions require advanced medical care?
>
> A. I would not make that determination on my own, no. I'm not a doctor.

Nielsen Dep., 98:2–10. Nielsen consistently acknowledged he was not qualified to opine whether a patient is stable for evacuation or to make independent medical assessments. *Id.*, 99:7–11 (not qualified to opine whether a patient is stable for evacuation); As he put it, "I am relying on the information provided by other documents. This is not my medical assessment." *Id.*, 100:5–07 ("I am relying on the information provided by other documents. This is not my medical assessment."); *id.*, 109:16–22. He confirmed, "I would not independently come to that conclusion, no. I'm not a doctor," and "I would not independently come up with a medical opinion." *Id.*, 131:11–16; 133:13–15.

This is not a newly minted litigation position. Nielsen described the identical boundary when explaining his work in prior matters: "I was not providing a medical opinion. It was once the condition was known and diagnosed — whether or not it should have been documented or

[1] Princess is owned by Carnival Corporation Ltd. *See* Carnival – Our Common Vision, https://www. carnival.com /about-carnival/about-us (last visited Aug. 31, 2026) ("Carnival Cruise Line is proud to be part of a family of companies owned by Carnival Corporation Ltd., which includes sister lines Princess Cruises, Holland America Line and Cunard Line, among others.); Princess – Our story, our promise, https://www.princess.com/about-princess (last visited Aug. 31, 2026) ("Princess is part of Carnival Corporation Ltd "). Furthermore, several of Carnival Corporation Ltd.'s policies and procedures apply to and are followed by Princess.

characterized as a lost-time incident . . . ." Nielsen Dep., 78:16–23. Plaintiff will not ask Nielsen at trial to testify that Mrs. O'Malley clinically required evacuation at 6:30 p.m., 10:00 p.m., or any other hour. To the extent Princess seeks an Order confirming that limitation, Plaintiff does not oppose it — but a limitation on scope is not a basis to strike the witness. Nielsen may properly assume the medical predicate established by the physicians and testify to what the vessel could and should have done in response to it.

## IV. RULE 703 PERMITS RELIANCE ON THE CHART, THE DECK LOGS, AND THE PLEADINGS — AND BOTH SIDES' PHYSICIANS NOW SUPPLY THE MEDICAL PREDICATE.

Federal Rule of Evidence 703 provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

"An expert is permitted 'wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.'" *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 374 (M.D. Fla. 2018) (citing *Daubert*, 509 U.S. at 592). Experts are entitled to rely on facts or data in the case that they "(1) personally have observed, or (2) of which they have been made aware." *Christiansen v. Wright Med. Tech., Inc. (In re Wright Med. Tech., Inc.)*, 127 F. Supp. 3d 1306, 1319 (N.G. Ga. 2015). "When an expert relies on inadmissible information, Rule 703 requires the trial court to determine whether that information is of a type reasonably relied on by other experts in the field. If so, the expert can rely, under Rule 703, on the information in reaching an opinion." *Id*. (citing Fed. R. Evid. 702, Advisory Committee's Notes (2000 Amendments)).

Princess makes much of the fact that Nielsen's report footnotes the Complaint for the timing of when Mrs. O'Malley's condition became known. Nielsen Report at 24 & n.56; Nielsen Dep., 100:8–12. That is exactly what Rule 703 contemplates. An expert may assume facts to be proven by others. Nielsen was candid about the limits of what he had: he confirmed he had not been provided deposition transcripts before signing the report. Nielsen Dep., 84:10–24. His report expressly reserved the right to supplement on that basis. Nielsen Report at 5, 23, 33 ("The author may supplement or amend this report should additional information become available and provided for review.").

More importantly, the assumed predicate has since been confirmed — ***by both sides***. After signing his report Nielsen received the reports of Dr. Gomez (Plaintiff's shipboard medical expert), Dr. Parejo (Princess's medical expert), and Captain Miller. Nielsen Dep., 12:2–13. He testified that all three support rather than undercut his conclusions. *Id*., 13:2–17 ("the information from each of those reports go toward supporting my opinions"; none "would have led me to generate new opinions"). On the critical timing, he was unequivocal:

> Both medical reports are consistent with that 22:50 timing. Both medical experts make the statement that . . . she was in shock and required immediate attention at that 22:50 timeframe on the evening of the 6th.

Nielsen Dep., 141:4–10; 136:20–137:07 (Dr. Gomez's 18:36 examination findings of moderate dehydration, tachycardia, volume depletion, and urinary tract infection are consistent with Nielsen's 6:30 p.m. reference point); *id*., 138:20–139:02 (Dr. Gomez places Mrs. O'Malley in "profound, life-threatening shock, physiology consistent with septic shock" on readmission at 22:50).

A defendant cannot simultaneously argue that its own expert's medical findings are sound and that a maritime expert may not rely on them. It is well-established that "it's reasonable for an expert such as yourself to rely upon the reports and opinions of other experts." Courts in this Circuit have repeatedly held that questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. at 374. "While that may be fruitful cross examination bearing on the weight of his opinions, it does not render his methodology of usage and context unreliable." *Id*.

## V. THE AIS-BASED POSITION AND DIVERSION ANALYSIS IS OBJECTIVELY VERIFIABLE AND WAS NOT GUESSWORK.

Nielsen's core operational opinion rests on data anyone can check. Vessel positions come from the Emerald Princess's own Automatic Identification System transmissions, purchased through VesselFinder and rendered through that vendor's Voyage Analyzer. Nielsen Dep., 23:16–24:02 ("The data points that I used are from the vessel's AIS . . . . The only information on those screenshots that was not provided by Vessel Finder would have been the red circles showing the specific data points at certain times."); Nielsen Report at 12–15, 25. The diversion estimates are arithmetic performed on that data:

> It is an approximate time, it's based on vessel speed, it's based on vessel position. I know what the speed is of the vessel at every one of those data points. I know the total distance it's traveled and how long it's taken . . . .

Nielsen Dep., 102:23–103:04. At 11:00 p.m. ship time the vessel was approximately 35 miles southwest of San Diego and 55 miles northwest of Ensenada. Nielsen Report at 15, 26; Nielsen Dep., 118:1–7.

Nielsen also confirmed that no artificial-intelligence tool generated any of the data. He uses a search assistant only to locate primary sources, which he then retrieves and verifies himself:

> I would not ask Grok something and cut and paste that, put it in a report, and footnote it. I would use it to find sources, and then I would drill down to the actual source . . . .

Nielsen Dep., 22:25–23:05; 23:16–17 ("No, I did not" use AI to plot the ship's itinerary). Whatever else may be said about the opinion, its inputs are transparent, sourced, and independently testable — which is the whole of what Rule 702(b)–(d) demands. As the Eleventh Circuit explained in *Quiet Technology*, "Because [the expert's] methods and results were discernible and rooted in real science — i.e., were 'intellectual[ly] rigor[ous]' — they were empirically testable. As such, they were subject to effective cross examination and, indeed, were questioned vigorously." *Barton*, 909 F.3d at 1333 (citing *Carmichael*, 526 U.S. at 152).

## VI. THE SUBJECTS NIELSEN DID NOT RESEARCH WERE DELIBERATELY EXCLUDED FROM THE OPINION AND GO TO WEIGHT.

Princess's longest passages catalogue what Nielsen did not investigate: how many berths San Diego or Ensenada had free that night, whether a harbor pilot was on duty, what paperwork the Mexican port authority requires. Nielsen Dep., 111:3–112:05; *id*. 113:12–23; 114:12–16; 115:16–24; 117:1–20. But Nielsen did not opine that the vessel had to reach a particular berth. He opined that the vessel could have diverted, and he expressly left the execution details to those who would have had to work them out in real time:

> I do not specify whether it would require the vessel physically tying up to the cruise pier, or to a cargo pier, or to be met by a boat just off the pier, or just inside the harbor, or just outside the harbor. I do not get into that level of specificity. That would have to be determined by the vessel and the shoreside facilities, the shoreside providers.

*Id*., 112:11–18; Nielsen confirmed that "the availability of a cruise berth was not critical to the opinion" and acknowledged logistics unknowns because "the vessel did not go there. *Id*., 111:18–

23 (“the availability of a cruise berth was not critical to the opinion”); *id*., 115:24–116:09 (acknowledging logistics unknowns because “the vessel did not go there”).

Nor did Nielsen ignore weather; he reviewed the ship’s own logs for the full three-day period and omitted a helicopter option because of what he found. Nielsen Dep., 94:17–25 (“I did review the weather throughout the entire three days . . . . If it had been calm seas and calm winds, I would have added in the potential for a helicopter transfer. It was intentionally left out of my report because of the weather.”). That is a conservative analytic choice, not an oversight. On this point Nielsen and Princess’s own Captain Miller substantially agree: neither a helicopter nor an open-water small-boat rendezvous was the answer; the vessel would have had to come in close to port. *Id*., 92:25–93:04 (“My report does not recommend a helicopter evacuation.”); *id*., 96:05–21 (“consistent with Captain Miller’s report, the cruise ship would have to divert, move in close to port”).

Finally, the alleged imprecision is immaterial to the conclusion. Nielsen’s bottom line is a delay measured in days, not minutes, and it survives generous error bars: “[I]f both of those estimates took twice as long, the bottom sentence of that is still in excess of 30 hours.” Nielsen Dep., 119:10–12; *see* Nielsen Report at 26, 31 (delay of more than 36 hours). Princess is free to press every one of these points before the jury. Rule 702 does not make them grounds for exclusion. “The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.” *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345. The Eleventh Circuit has held that “in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.” *Barton*, 909 F.3d at 1333; *Rosenfeld*, 654 F.3d at 1193. As the Court explained in *Rosenfeld,* “these arguments attack the weight and the persuasiveness of [the expert’s] testimony, not its admissibility,” and opposing counsel could raise their “‘incorrect assumptions’ and imprecise/unspecific opinions’ arguments at trial ‘through vigorous cross-examination’ and ‘presentation of contrary evidence.’” *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2020 U.S. Dist. LEXIS 266964, at *22 (N.D. Ga. Dec. 2, 2020) (quoting *Rosenfeld*, 654 F.3d at 1194).

## VII. NIELSEN'S EXPERIENCE IS A PERMISSIBLE BASIS UNDER RULE 702, AND HE EXPLAINED HOW THAT EXPERIENCE LEADS TO, SUPPORTS, AND IS RELIABLY APPLIED TO EACH OPINION.

Pages 8 through 12 of Princess's Motion reduce to a single proposition: that a witness who reasons from experience has offered no methodology at all. That is not the law, and it is not this record. Rule 702 lists experience as an independent qualifying basis, and the Advisory Committee has explained that "[i]n certain fields experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The Supreme Court has said the same: "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Carmichael*, 526 U.S. at 156. The four factors Princess recites—testing, peer review, rate of error, and general acceptance, Mot. at 8—"may or may not be pertinent" depending on "the nature of the issue, the expert's particular expertise, and the subject of his testimony," and they may never be applied as a "definitive checklist or test." *Id*. at 150; *Maiz*, 253 F.3d at 665. Demanding "peer-review supported theories," Mot. at 13, for Nielsen's opinions mistakes the inquiry.

Princess supplies the correct test and then declines to apply it to the record. Quoting *Jackson*, Princess acknowledges that a witness relying primarily on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Mot. at 8 (quoting *Jackson*, 2025 WL 3140630, at *5). Nielsen did each of those three things—in the deposition Princess took and in his report Princess attached as its own Exhibit C.

### A. How the experience leads to the conclusions reached.

Opinions Two and Three are safety-management-system opinions, and Nielsen's experience is precisely that of a safety-management-system professional. He was among the first cohort of ISM Code auditors trained anywhere. Nielsen Dep., 50:1–9. He audited operating companies' safety management systems as those systems were first being implemented, and Carnival Corporation hired him away from the American Bureau of Shipping in 1997 for that reason. *Id*., 50:10–17. As Carnival's Director of Maritime Audit, his group reviewed and audited each operating company's medical policies and procedures to confirm they met corporate thresholds. *Id*., 50:22–51:7. As Designated Person Ashore—a role the ISM Code itself mandates—he reported directly to the president of Cunard and Seabourn and served as the shipboard crew's

escalation channel outside the ordinary chain of command. *Id*., 43:7–44:5. He authored the safety management system for two cruise lines operating international itineraries under multiple flag states and classification societies. *Id*., 47:17–48:6; Nielsen Report, Att. 1. The route from that experience to Opinions Two and Three is short and direct: Nielsen read Carnival's MED-3104 series the way he was trained for years to read safety management documents, and he identified the gap between what the written policy delegates to the treating physician and what ISM Code § 5.2 reserves to the master. Nielsen Report at 17–18, 27–29.

Opinion One is a vessel-movement opinion, and Nielsen's experience is precisely that of a mariner. He holds a Bachelor of Science in Marine Engineering Systems from the United States Merchant Marine Academy—a program in which cadets sail aboard commercial vessels as part of the curriculum—and United States Coast Guard licenses through Chief Engineer of Motor Vessels of any Horsepower. Nielsen Dep., 31:8–16; Nielsen Report at 6. He spent years aboard vessels underway, including cruise ships at sea for five to seven days at a stretch during audits, working on the bridge and reviewing bridge team management and the vessel's charts. Nielsen Dep., 59:18–24; 60:8–22. That experience is what permits him to convert an AIS position and a known speed into a steaming time: "I know what the speed is of the vessel at every one of those data points. I know the total distance it's traveled and how long it's taken . . . ." *Id*., 102:23–103:04.

Nor is Nielsen's experience with this particular subject matter—escalating a shipboard medical evacuation ashore—merely theoretical. At Cunard and Seabourn he was the shoreside point of contact for medical evacuations that were "in some way not normal, not standard," requiring additional notifications or coordination with regulatory bodies. *Id*., 55:22–56:6. Routine in-port disembarkations did not reach him; the difficult ones did. *Id*., 56:16–22. He was involved "once every six weeks, twice every three months." *Id*., 57:13–16. He has since authored at least six expert reports addressing whether a person should have been kept aboard rather than sent ashore for care. *Id*., 75:12–17. That is the experience underlying his central operational point—that the captain, not the physician, is the person who knows what diversion options exist at a given hour. *Id*., 129:11–24.

**B. Why that experience is a sufficient basis for these opinions.**

Nielsen did not offer experience as a substitute for method; he offered it alongside one. His report identifies the framework he applied by name—the ABS *Guidance Notes on the Investigation of Marine Incidents* (Feb. 2014), a published, industry-standard investigative protocol—and sets

out the sequential steps it prescribes for gathering information, establishing the sequence of events, and identifying contributing conditions and causal factors. Nielsen Report at 7 & nn.9–11. He then measured the crew's conduct against external, published benchmarks rather than against his own preferences: ISM Code § 5.2, SOLAS ch. V, reg. 34-1, the CLIA guidelines Princess has committed to meet or exceed, and Carnival's and Princess's own written procedures, which he quotes verbatim rather than characterizes. Nielsen Report at 17–20, 27–31. That is the opposite of the "it is so because I say it is so" testimony Princess invokes. Mot. at 5. The yardsticks are Princess's own documents.

Equally telling is where Nielsen declined to extend his experience. He offered no opinion on United States Coast Guard operational capabilities, asset types, or range limits. Nielsen Dep., 91:16–92:12. He offered no opinion on the method or handling of the evacuation that actually took place on February 8th. *Id*., 26:5–11. He reviewed the vessel's own logs for weather and sea state across the full three-day period and deliberately omitted a helicopter option because of what he found. *Id*., 94:17–95:1. He declined to specify a berth, a pier, or a standoff distance. *Id*., 112:11–18. A witness who marks the outer boundary of his own competence—repeatedly, and at cost to the party retaining him—is demonstrating a method, not concealing the absence of one.

**C. How that experience was reliably applied to the facts of this case.**

Princess's catalogue of unresearched details, Mot. at 10–11, is in substance a catalogue of experiential premises that Nielsen identified openly and that Princess is free to test. He explained that cruise berths in United States ports are typically empty at night because ships work an early-morning to early-evening turn—and then explained that the point did not matter, because his opinion does not require a berth at all. Nielsen Dep., 111:13–23. He explained that San Diego is a twenty-four-hour port with vessels transiting around the clock, which is why he did not treat pilot availability there as an open question. *Id*., 113:18–23. He explained that harbor pilots are not vessel-type specific—the same pilot "may bring in a container ship today and a cruise ship tomorrow." *Id*., 114:2–5. He explained that a single medical transfer, landing no other passengers and taking on no stores, would not require a full customs and immigration clearance. *Id*., 115:4–15. And he identified, without prompting, what would still have to be worked out in real time and by whom. *Id*., 114:12–16; 115:22–116:9. Each answer names the experiential premise, states it in the open, and exposes it to cross-examination. That is what Rule 702 asks for.

It is also what *Brashevitzky* requires. The expert there invoked "experience" as a bare label, without connecting it to the opinion rendered. 348 F.R.D. at 118. Nielsen supplied the connective explanations on every point Princess raises—which is precisely why Princess can quote him at such length in its Motion.

**D. The *Valencia-Lopez* and *Mamani* cases cited by Princess do not fit this record.**

Princess's foreign-operations authorities, Mot. at 9, address a different problem. *Valencia-Lopez* concerned a federal agent's opinion about how Mexican drug-trafficking organizations behave. The Ninth Circuit's objection was that the agent had no experience operating within Mexico and offered "no explanation of his methodology," leaving "too great an analytical gap" between what he had done and what he concluded. 971 F.3d at 900–01. *Mamani* excluded an anthropologist who had performed no first-hand data collection in the country about which he opined. 2018 U.S. Dist. LEXIS, at *18-19. Both cases turn on an expert reaching conclusions about *foreign institutional behavior* he had never observed and could not explain.

Nielsen offers no opinion about Mexican custom, Mexican institutional behavior, or Mexican regulatory practice. Asked whether he had reviewed Mexican Port Authority policies and procedures, he said he had not—and explained that his opinion does not depend on them. Nielsen Dep., 115:22–116:9. What the opinion does depend on is where the *Emerald Princess* was, how fast she was making way, and how long it would have taken to cover the intervening water. Nielsen Report at 25–26. Those inputs are the vessel's own AIS broadcasts, purchased from a commercial aggregator and rendered through that vendor's voyage analyzer. Nielsen Dep., 23:16–24:02. Arithmetic performed on a ship's own position reports does not become unreliable because one of three candidate destinations happens to lie south of the border.

Two features of this record make the analogy weaker still. First, two of the three ports in Opinion One—Los Angeles and San Diego—are United States ports, and the earliest and largest diversion window Nielsen identifies is a return to Los Angeles. Nielsen Report at 25–26; Nielsen Dep., 102:13–21. Princess cannot use a foreign-operations case to exclude an opinion about American ports, a stretch of the Southern California coast, and a vessel that had departed Los Angeles hours earlier. Second, Nielsen's professional experience is itself international rather than domestic. The ISM Code is an instrument of the International Maritime Organization, and Nielsen authored a safety management system covering two cruise lines running international itineraries under multiple flag states and classification societies. Nielsen Report, Att. 1; Nielsen Dep., 47:17–

48:6. This is not the *Valencia-Lopez* profile of a purely domestic witness opining on a country in which he has never worked.

Nor was Ensenada an unresearched guess. Nielsen confirmed that medical disembarkations into Mexican ports do occur and that he looked into them, Nielsen Dep., 114:24-115:7, and his report cites a published account of a Mexican Navy medical evacuation from a cruise ship at Ensenada. Nielsen Report at 17 & n.28. Princess is of course free to argue that Ensenada would have been slower or harder than Nielsen estimates. That is an argument about how much time was lost, not about whether the opinion may be heard.

**E. The "Grok" characterization is not what the cited testimony says.**

Princess tells the Court that Nielsen's report and testimony identify no "references, publications, articles, studies, research, or other materials consulted aside from vague references to Internet or Grok searches," Mot. at 11 (citing Tr. 22:13–23:5). The cited passage says the opposite. Nielsen testified that he uses a search assistant the way others use a search engine—to locate primary sources—and then retrieves and verifies the source itself:

> I would not ask Grok something and cut and paste that, put it in a report, and footnote it. I would use it to find sources, and then I would drill down to the actual source, make sure that what Grok found is actually what I'm looking for, and then I would reference the actual source after going there.

Nielsen Dep., 22:25–23:05. He explained why, unprompted: "I read too many horror stories about AI—not imagination, but hallucinations and I'm going to do everything I can to make sure that I don't make that mistake." *Id.*, 23:07–10. And he confirmed that no such tool played any part in the position analysis, which came from purchased AIS data. *Id.*, 23:11–24:02. A witness who insists on retrieving and checking primary sources is describing diligence, not the absence of it. The one document Princess points to as the product of that search—a published news account of a Mexican Navy evacuation—is cited in the report to its own source. Nielsen Report at 17 & n.28.

**F. The rule Princess proposes would exclude every experience-based maritime expert.**

Stripped of its citations, Princess's position is that Nielsen may not testify because he has never personally effectuated a medical transfer at San Diego or Ensenada. Nielsen Dep., 118:8–13; Mot. at 12. But the qualification standard is "not stringent," as Princess's own Motion concedes, and objections to the level of an expert's expertise go "to credibility and weight, not

admissibility." Mot. at 7 (quoting *Jackson*, 2025 WL 3140630, at *4). An expert need not have practiced in the precise sub-specialty at issue; the fit between credentials and subject matter is what matters. *Maiz*, 253 F.3d at 665.Princess cannot concede the standard on page 7 of its Motion and then ask the Court to exclude under a stricter one on page 12.

Furthermore, Opinion One concerns a diversion that never happened. Under Princess's standard no witness could ever testify about it, because no one has hands-on experience of a counterfactual situation. The same reasoning would bar the accident reconstructionist who has never crashed a car and the marine surveyor who has never sunk a ship. Rule 702 does not require that an expert have lived the alternative he describes. It requires that his reasoning from what he does know be explained, grounded, and testable. Nielsen's reasoning is all three, and Princess may test every premise identified above in front of the jury during its cross-examination. *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345; *Barton*, 909 F.3d at 1333. What Princess has not identified is any reason the jury should be kept from hearing Nielsen's reasoning.

## VIII. THE PURPORTED PAGE 24 TIME REFERENCE IS AN INTERNAL INCONSISTENCY ACKNOWLEDGED BY PRINCESS THAT DOES NOT INFECT THE ANALYSIS.

Princess devotes substantial argument to a single sentence on page 24 referring to "approximately 10:00 p.m.," which does not match the 11:00 p.m. reference used elsewhere. Nielsen did not defend the discrepancy; he acknowledged it and explained why it changes nothing. The calculations that actually drive the opinion appear on page 26 and are keyed to 11:00 p.m. Nielsen Dep., 116:20–24 ("on page 26, the time calculations that I do are based on 11:00, so if there's any confusion between page 24 and 26, the calculations are clearly done on page 26 based on 11:00 p.m."); Nielsen Report at 26. And the discrepancy, if resolved against Nielsen, helps Plaintiff rather than Princess: "if this is an error, then the error, if corrected and the time is moved up an hour, makes a diversion even more possible." Nielsen Dep., 108:04–06; *see also id.*, 107:22–24.

Nielsen was equally candid that the report would have been cleaner with a footnote. Nielsen Dep., 107:10–12 ("As we sit here today, I agree with you, I've left two times for the same event in an opinion without explaining why they're different."). That concession is the beginning of a cross-examination, not the end of an admissibility analysis. It is also worth noting that the underlying timekeeping confusion originated with Princess's own records: the SeaCare system

was logging entries an hour ahead of actual time, a defect Princess's own paramedic flagged in the chart. Nielsen Report at 16 (quoting chart entry GR000069 noting that some entries "ARE LOGGED AN HOUR AHEAD OF ACTUAL TIME AS SEACARE SEEMS TO KEEP RESETTING ITSELF") (emphasis in original); Nielsen Dep., 80:17–20; 81:08–13 (Nielsen resolved the conflict by using the official ship log, which references ship time to UTC).

The Advisory Committee notes to Rule 702 caution that "the rejection of expert testimony is the exception rather than the rule," and that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Morris v. Fla. Transformer, Inc.*, 455 F. Supp. 2d 1328, 1332 (M.D. Ala. 2006). "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (citation omitted).

## IX. NIELSEN'S ISM CODE OPINIONS DESCRIBE AN INDUSTRY STANDARD OF CARE, NOT A LEGAL CONCLUSION.

Opinions Two and Three concern the relationship between Carnival's written procedures and the ISM Code's allocation of overriding authority to the master. Nielsen Report at 17–18, 27–29 (quoting ISM Code § 5.2 and SOLAS ch. V, reg. 34-1); Nielsen Dep., 119:19–120:08. Nielsen explained the regulatory architecture with precision: CLIA's statement is industry guidance, which becomes binding only when a member incorporates it into its safety management system, at which point the ISM Code makes it enforceable. Nielsen Dep., 123:22–124:05 ("this statement by CLIA is not the regulation. It's industry guidance which is then put into the safety management system of each individual company, which then makes it part of the ISM Code, which makes it a regulation."). That is testimony about how the industry's standards operate — the paradigm case for expert assistance — and it is grounded in Princess's own documents, which Nielsen quotes rather than paraphrases. Nielsen Report at 27 (quoting MED-3104 § 2.1: "The decision to disembark a patient is the responsibility of the ship's treating doctor."); 28–29, 30–31 (reproducing the MED-3104-A5 workflow).

Nielsen's criticism is narrow and operationally grounded. He does not contend a captain should override clinical judgment. He contends the captain alone knows what diversion options exist at a given moment, and the policy defers his involvement until after the disembarkation decision has already been made:

> The doctor would be faced with a situation where, "I may need to medically disembark this person, the policy says let the captain know now, because he knows what our options are, not me."

Nielsen Dep., 129:21–24; *see also* 122:02–16 ("had there been communication with the captain . . . that would have given the captain the opportunity to say to the doctor, 'If we don't do it now, we're waiting 36 hours.'"); *id.*, 128:18–129:09.

The factual premise — that the captain was not brought in on February 6th — rests on the absence of any entry in records that would have captured it. Nielsen Dep., 130:12–20 ("had the captain been informed and there was any change made to the operation of the vessel, that would have been noted in the deck log[;] . . . there was nothing of the sort in either the deck logs or the . . . chart in this case."); Nielsen Report at 22 (deck log contains no reference to bridge–hospital communications). That inference has since been corroborated by Princess's own expert. Nielsen Dep., 142:02–05 (earliest indication of captain involvement is "log entries on the afternoon of 7th February," a conclusion "later supported by Captain Miller's report"); *id.*, 131:01–03. To the extent Princess contends any particular phrasing crosses into a legal conclusion, the appropriate remedy is a limiting instruction or a narrowing of phrasing at trial — not wholesale exclusion. *Cf. Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

## CONCLUSION

Gerald Nielsen is a forty-year maritime professional, an original-cohort ISM Code auditor, a former Carnival Director of Maritime Audit, and a former Designated Person Ashore, offering opinions about vessel position, port accessibility, and a cruise operator's compliance with its own safety management system. He has disclaimed the medical opinions Princess spends most of its motion attacking. The remainder of the motion identifies imperfections — an unfootnoted sentence, a time reference that does not match its neighbors, logistics he declined to specify — that Princess may exploit on cross-examination in front of the jury. *Quiet Tech.*, 326 F.3d at 1345. As the Supreme Court recognized in *Daubert*, "the inquiry envisioned by Rule 702 is [...] a flexible one." *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (citing *Daubert*, 509 U.S. at 594). "Many factors will bear on the inquiry, and [there is no] definitive checklist or test." *Id.* (citation omitted). The district court's gatekeeping function "is not intended to supplant the adversary system or the role of the jury." *Id.* at 666 (citing *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)).

Princess's points, as one district court noted in analogous circumstances, "are not lost on the court." *Raffensperger*, 2020 U.S. Dist. LEXIS 266964, *23 (citing *Landeros v. Barbieri*, No. 96 Civ. 7809 (RLE) (LAK), 1998 U.S. Dist. LEXIS 670, at *3 (S.D. N.Y. Jan. 27, 1998)). However, "*Daubert* prescribes the proper remedy for 'shaky but admissible' expert evidence: '[v]igorous cross-examination [and] presentation of contrary evidence.'" *Id*. (citation omitted).

Plaintiff respectfully requests that the Court deny Princess's Motion, subject only to the scope limitation Plaintiff has already accepted: that Mr. Nielsen will not offer independent clinical or diagnostic opinions.

Respectfully submitted,

By: /s/ *Laurence M. Krutchik, Esq.*
LAURENCE M. KRUTCHIK, ESQ.
Florida Bar No. 0069449
LMK LEGAL
LMK@LMKLEGAL.COM
7450 SW 172nd Street
Palmetto Bay, Florida 33157
Telephone: (305) 537-6866
*Co-Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 31, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specific, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ *Laurence M. Krutchik, Esq.*
LAURENCE M. KRUTCHIK, ESQ.

**SERVICE LIST**

Michael J. Drahos, Esq.
Email: michael.drahos@gray-robinson.com
Ashley Genoese, Esq.
Email: ashley.genoese@gray-robinson.com
GRAY ROBINSON
515 North Flagler Drive
Ste 1425
West Palm Beach, FL 33401
561-268-5727
Fax: 561-268-5745
*Attorneys for Defendant*

Thomas B. Scolaro, Esq.
SCOLARO LAW
1728 Coral Way, Suite 702
Miami, Florida 33145
Email: tom@usinjury.law
Telephone: (305) 424-2300
Facsimile: (305) 424-2140
*Attorney for Plaintiff*